**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A. DUIE PYLE, INC., Respondent.**

**No. 78–2223.**

United States Court of Appeals, Third Circuit.

Argued July 10, 1979.

Decided Sept. 14, 1979.

Kenneth B. Hipp, Sharon A. Gallagher (argued), N. L. R. B., Washington, D. C., for petitioner.

Timothy P. O'Reilly (argued), Dennis J. Morikawa, Michael A. Hacker, Morgan, Lewis & Bockius, Philadelphia, Pa., for respondent.

Before ADAMS, ROSENN and HIGGIN-BOTHAM, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In this case the National Labor Relations Board ("Board" or "NLRB") seeks enforcement of its order directing a common carrier to bargain with truck owner-operators who lease their vehicles to the company. The critical issue is whether these truckers are "employees," or are "independent contractors" who are expressly exempted from the coverage of the National Labor Relations Act, as amended, 29 U.S.C. § 152(3) (1976). Because the Board's ruling that the truckers are employees does not have a reasonable basis in law and is not fairly supported by substantial evidence, we decline to enforce the Board's bargaining order.

### I.

#### A.

A. Duie Pyle, Inc. ("Pyle" or the "company"), is an interstate common carrier. This case concerns operations at its terminal located in Morrisville, Pennsylvania. To make deliveries, Pyle engages a group of "owner-operators," who own their trucks and operate them under lease to the company. These owner-operators, and other drivers selected by them to run their vehicles, have designated as their bargaining representative the Fraternal Association of Special Haulers (the "Union").[1] When the Un-

---

1. In a group of cases captioned *United States Steel, et al. v. Fraternal Association of Steel Haulers, et al. ("FASH")*, 601 F.2d 1269, 1271 (3d Cir. 1979), we described FASH as follows:

    FASH is more than one organization. Described by the district court as "a 'siamese' triplet of three separate yet combined entities," it is first a national federation of associations formed to promote "the mutual protection and advancement of the interests and general welfare of independent tractor-trailer owner-operators, drivers, and allied occupations in the general business of hauling and transporting steel and steel products." In addition, the term FASH may refer to the Fraternal Association of Steel Haulers of Western Pennsylvania, chartered as a Penn-

    sylvania not-for-profit corporation in 1968, for the purpose of promoting the "desires of persons connected with the steel hauling industry whether such persons be owners of vehicles, drivers of vehicles, or owner-operators." A third facet of FASH is the Fraternal Association of Special Haulers . . . ., described by William J. Hill President and Chairman of all the defendant associations, as "the union part of FASH."

    (citations and footnote omitted). This is not the first time we have had to consider litigation concerning the organizing activities of FASH. In 1970, we sustained a preliminary injunction against certain picketing and interference by FASH. The district court had issued the injunction on the ground that FASH was an organization of businessmen rather than employees and was therefore outside the labor exemp-

ion demanded that Pyle bargain with it, the company refused, contending that the owner-operators are not the company's employees but are instead independent contractors and that the other drivers are employees of the owner-operators who hire them.

■ If the owner-operators are independent contractors, they do not fall within the protection of the labor laws, and the company has no duty to bargain with their designated representative: "The term 'employee' . . . shall not include . . . any individual having the status of an independent contractor . . . ." 29 U.S.C. § 152(3) (1976). The NLRB has concluded, however, that the owner-operators and other drivers are employees of Pyle and that its refusal to bargain violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act. The Board has issued an order directing Pyle to bargain with the Union and has brought this application to enforce its order.

■ Whether the drivers are employees or independent contractors is a question of agency law. *NLRB v. United Insurance Co.*, 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). The law of agency looks to " 'the degree to which the principal may intervene to control the details of the agent's performance . . . .' " *NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 562 (3d Cir. 1962), quoting *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 717 (2d Cir. 1943) (L. Hand, J.). We have interpreted the common law test of this "right to control" to require an examination of "the type of services rendered, the possibility of realizing additional profits through the exercise of entrepreneurial skill and the ownership and maintenance" of equipment. This inquiry canvasses both "the language of the contract" and "the practice of the parties, the skill required . . . , the mode of compensation for additional duties, and the methods of applying corrective and

disciplinary measures." *News-Journal Co. v. NLRB*, 447 F.2d 65, 68 (3d Cir. 1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972). We are admonished that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *NLRB v. United Insurance Co., supra*, 390 U.S. at 258, 88 S.Ct. at 991. We, therefore, turn to the facts of this case, giving particular attention to the degree of Pyle's control over the drivers and the other factors to be considered. The facts emerge from three sources: the agreements between Pyle and the owner-operators, the federal laws and regulations governing interstate carriage of goods, and the actual practice of the company and the owner-operators.

### B.

The owner-operators, rather than Pyle, own the vehicles and all other equipment used for shipment of goods. These approximately forty owner-operators lease the equipment to Pyle under written agreements that are for a minimum of thirty days, are terminable by either party for any reason upon ten days notice, and may be cancelled immediately for breach of the contractual terms. Some of the owner-operators do business as corporations or partnerships.

This lease defines much of the relationship between the company and the owner-operators. As the Board's Regional Director concluded in a decision affirmed by the Board, under the lease the "owner directs the operation of its vehicles in all respects . . . ." The owner-operator decides whether to accept any particular load from Pyle and is free to reject a load for any reason. If the owner-operator accepts a load, he chooses the days and times of operation and selects the routes to be traveled.[2] The owner-operator may engage

---

tion from the antitrust laws. *United States Steel v. FASH*, 431 F.2d 1046 (3d Cir. 1970). In 1971 the injunction was made permanent by consent. Recently, in the opinion from which we quote above, we reversed a modification of that injunction.

2. The underlying conflict between Pyle and the owner-operators is not the typical labor dispute. The owner-operators apparently will not seek to negotiate collectively over hours or working conditions, which they themselves already set. It is not clear that they seek to

in "trip-leases," which are contracts to haul for companies other than Pyle. (The owner-operators often enter into trip-leases when they are returning after having made deliveries for Pyle.) In all of their work for Pyle, the owner-operators must repair their own vehicles and, as the Regional Director observed, must "pay for all costs of operation such as maintenance, fuels, lubricants, tires, licenses, registration fees, toll charges, decals, and fines and penalties arising out of the use of the equipment . . . ." (The State of New York, however, requires the company to pay taxes for the owner-operators' use of the roads.) The owner-operators bear the risk of loss from damage to the vehicles, and any insurance against such loss would be at the owner-operators' expense. The compensation to the owner-operators for their work is set at 75% of the total revenue for the shipments. The lease also records the parties' intention to create the relationship between a "carrier" and an "independent contractor."

To comply with regulations of the Interstate Commerce Commission ("ICC"), the company is said in the lease to assume "exclusive possession, control and use" of the *vehicle*, but only to the extent demanded by obedience to ICC regulations. The lease discharges Pyle of responsibility for the vehicles when operated in the service of the owner-operators, and the owner-operators agree to hold Pyle harmless for any liability that may be asserted against the company. Although the owner-operators may choose their own drivers, they are required to furnish persons who satisfy the safety regulations of the Department of Transportation ("DOT"), and who obey all other federal, state, and local laws.

Other federal regulations also shape the relationship between the company and the owner-operators. They require that the company obtain from a prospective driver a written application and proof that he has passed a physical examination, 49 C.F.R. §§ 391.21, 391.41, 391.51 (1978), and admin-

ister to him road tests and written examinations, 49 C.F.R. §§ 391.31, 391.35. Pyle must compile records concerning violations of the drivers and must annually review each driver's record to determine if he meets federal safety standards. 49 C.F.R. §§ 391.25, 391.27, 394.9, 394.13. As to all of these requirements, Pyle must keep certain records, 49 C.F.R. §§ 391.51, 1020.1, and the company must require a daily log from every driver, 49 C.F.R. § 395.8. Pyle must also affix to a leased truck markings that identify the company and its ICC number. 49 C.F.R. §§ 1058.2, 1058.3. For the time that the vehicles are in its service, Pyle maintains public liability and cargo insurance on the equipment, but as noted *supra*, does not otherwise insure against loss due to accidents. 49 C.F.R. § 1043.1.

To the terms of the lease and the provisions of the regulations may be added the policies, practices, and particular occurrences that have arisen in the course of dealings between Pyle and the owner-operators. Through a commission agent, Pyle dispatches the owner-operators on a first-in first-out basis. Pyle extends no assistance to the owner-operators in the purchase or maintenance of their equipment. It does not provide the owner-operators with life or health insurance, holiday pay, vacation, or Christmas bonuses, and it does not pay for workmen's compensation insurance or social security. Neither does Pyle withhold income taxes for the owner-operators. Pyle handles relations with customers. It solicits from customers contracts for freight, bills the customers, receives customers' payments, manages complaints from customers, negotiates their claims for damage to cargo, and decides whether to bill customers for drivers' waiting time or for unused trucks.

Pyle does not discipline drivers for accidents or violations, nor does it supervise owner-operators when they are loading or unloading cargo or when they are driving. There was testimony, however, that on one

---

bargain about wages, because they are not compensated in that way. Apparently, their

primary objective is to bargain over the rates they receive for the hauling.

occasion Pyle did assess a driver $500 for damage due to his negligence. (It is unclear whether this amount reflects the deductible on the carrier's insurance.) The drivers do not wear Pyle uniforms, and vehicles bear no Pyle insignia other than the ICC identification required by federal law. As federal regulations command, the company does inspect vehicles for safety, and on one occasion a safety inspector employed by Pyle refused to allow a load to be hauled in a vehicle found unsafe.

Although owner-operators may, without adverse consequence, refuse to carry loads offered to them by Pyle, in one instance the commission agent passed over an owner-operator for a job because the owner-operator had previously declined a load. As the commission agent testified in Board proceedings, he had penalized the owner-operator in this way because the owner-operator had earlier threatened to "stick" him.

The owner-operator selects any other drivers who may be necessary for the operation of his vehicle. It is the owner-operator, and not the company, who hires, pays, and disciplines such drivers. Once, however, when an owner-operator proposed to hire a particular driver, Pyle told the owner-operator that the driver was a "troublemaker" and was unacceptable to the company. There was testimony that the prospective driver never filed an application with Pyle.

The company has established some additional policies concerning its Buffalo terminal, which about four of the forty drivers use. When a driver arrives in Buffalo, he has a choice whether or not to make himself available for work from the company. If he decides to indicate his availability, and if there are fewer than three trucks at the terminal, he must wait twenty-four hours before trip-leasing with another company. A driver who violated this policy lost the privilege of parking at the Buffalo terminal. Nevertheless, Pyle does not penalize drivers for choosing not to make themselves available for the company's work in Buffalo, and one driver testified that he does not contact Pyle at all when he is in that city.

Owner-operators arrange with other companies for trip-leases without Pyle's assistance. There was testimony that the owner-operator might receive direct payment for the trip-lease, but the Regional Director indicated that the payment is made to Pyle, which acts as a conduit and reissues the check to the owner-operator without making any deductions. The company forbids an owner-operator from promising to hold harmless a carrier with which the owner-operator trip-leases, because Pyle fears that such a hold-harmless clause might result in its own liability. The Board's Regional Director found, however, that the company has never attempted to enforce this prohibition. The Regional Director found that Pyle bears the risk of nonpayment by the customer. The company contests this finding. The company does not dispute that it sometimes advances $75 to owner-operators before they haul loads. Finally, the company does not bargain over the terms of the lease. The owner-operators can either sign or reject the lease as offered.

## II.

On these facts, the Regional Director of the NLRB, in a representation proceeding, ruled that the owner-operators were employees within the meaning of the National Labor Relations Act. An evenly divided Board declined to review the Regional Director's decision and thereby affirmed his ruling. The Board then conducted a representation election, which the Union won. After the election the company petitioned the Board to reconsider its decision against review of the Regional Director's ruling. The Board once again declined to review the decision of the Regional Director.

The company nevertheless refused to bargain with the Union, and the NLRB issued a complaint charging unfair labor practices. Admitting its refusal to bargain, Pyle contended that the owner-operators were not employees and that the company, therefore, had no duty to bargain with the union. Because the same issue had been decided against Pyle in the representation proceeding, the Board granted summary judgment

for the Union and ordered the company to bargain. The Board then brought this application to enforce its bargaining order.

We must decline to enforce a decision of the NLRB if the Board's ruling is unsupported by substantial evidence, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951), or is a misapplication of the statutory exemption for independent contractors, *Brown v. NLRB*, 462 F.2d 699, 702 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972). For this reason the order now before us cannot stand.

The record in this case bespeaks the company's lack of control over the details of the owner-operators' performance and indicates the owner-operators' opportunity for entrepreneurial skill, their ownership of equipment, and their freedom from discipline by the company. *See generally News-Journal Co. v. NLRB, supra*, 447 F.2d at 68. The owner-operators own their vehicles and other necessary equipment, the purchase of which they have financed without Pyle's assistance. They are free to accept or decline loads from Pyle. They choose their own routes and times of operation. The company does not supervise their loading or unloading or their driving and does not discipline them for accidents or traffic violations. The owner-operators, not the company, pay for repairs to their vehicles, maintenance, fuel, lubricants, tires, licenses, registration fees, toll charges, decals, and road fines. They may engage in trip-leasing with other companies or persons, for which they negotiate without Pyle's intervention and the proceeds from which they receive in full. They hire other drivers needed for the operation of their vehicles, and they set the pay of these drivers and impose discipline on them. The owner-operators do not wear Pyle uniforms, and their trucks bear only the ICC markings required by federal law. The company does not guarantee any volume or provide the owner-operators with typical fringe bene-

fits such as holiday pay, vacations, Christmas bonuses, social security insurance, life or health insurance, or workmen's compensation insurance; and it does not withhold taxes from the owner-operators. The agreement between Pyle and the owner-operators specifically expresses an intent to make the owner-operators independent contractors.[3]

Conceding these facts, the Regional Director relied on other considerations which, in his view, showed a relationship of employment. First, he noted the effects of federal regulations. Under these regulations, Pyle must inspect the owner-operators' vehicles for safety, maintain the owner-operators' daily logs, restrict its loads to drivers passing physical examinations and driving tests, take out public liability and cargo insurance, and assume possession, control, and use of the vehicles while in the company's service. As this court has written, government regulations are "a relevant part of the totality of circumstances from which the 'employee' determination [is] properly made." *Steel City Transport v. NLRB*, 389 F.2d 735, 738–39 (3d Cir. 1968). Nevertheless, these regulations by themselves do not establish that the owner-operators are employees of Pyle. They are designed to protect the shipping and highway-traveling public, not to facilitate control by the company over the owner-operators. Substantial precedent indicates that government regulations, standing alone, are insufficient to turn owner-operators into employees. They "may be considered in conjunction with other elements of the relationship in determining the status of an individual worker." *Merchants Home Delivery Service, Inc. v. NLRB*, 580 F.2d 966, 974 (9th Cir. 1978). They do not necessarily imply the existence of an employer-employee relationship. *Local 777, Democratic Union Organizing Committee v. NLRB*, 195 U.S.App.D.C. 280, 294, 603 F.2d 862, 876, 99 L.R.R.M. 2903, 2912 (1978); *Merchants Home Delivery Service, Inc. v.*

---

3. Although not conclusive, the intent of the parties is relevant. *Restatement (Second) of Agency* § 220(2)(i) (1958).

*NLRB, supra,* 580 F.2d at 974; *SIDA of Hawaii v. NLRB,* 512 F.2d 354, 359 (9th Cir. 1975); *Ace Doran Hauling & Rigging Co. v. NLRB,* 462 F.2d 190, 194 (6th Cir. 1972). *But see NLRB v. Deaton, Inc.,* 502 F.2d 1221, 1225 (5th Cir. 1974), *cert. denied,* 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975) (question reserved).

■ Second, the Regional Director observed that once "the Carrier through its commission agent . . . refused to dispatch a driver because he had previously refused to take a load" and that "[o]n one occasion the commission agent restricted another owner-operator as to who[m] he could hire to operate his leased truck." These instances, however, were isolated, and this proffered evidence of control is unsupported by evidence of any other similar incidents. In proceedings before the Board, the driver who was passed over after refusing a load gave testimony that illuminates the episodic character of that occurrence. As he testified, he had no reason to believe that the company intended to penalize owner-operators who refused loads in the future.

■ Third, the Regional Director found the absence of an arm's length relationship characteristic of a true independent contractorship, as the Employer unilaterally determines the terms of the owner-operator's percentage of load revenues for the lease of the equipment and the driver's services, as well as, the other terms of the lease arrangement.

Although it may be relevant that Pyle refused to negotiate over terms of the lease, this argument must carry very little weight. The Regional Director looked to bargaining power rather than to the relationship created between the parties, but it is the relationship that is pertinent to the determination whether the owner-operators are employees. Even if the stronger party may dictate the terms of a contract, the weaker party does not become an employee unless those terms create substantial control over the details of his performance. *Local 777, Democratic Union Organizing Committee v. NLRB, supra,* 195 U.S.App. D.C. at 288, 603 F.2d at 870, 99 L.R.R.M. at 2908 n.22. Those entering into contracts with the United States, for example, may have little power to bargain over terms, but they may still remain independent contractors. *See United States v. Orleans,* 425 U.S. 807, 815–16, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (parties subject to federal statutes and regulations may still be "independent contractors" under Federal Tort Claims Act).[4]

■ Fourth, the Regional Director pointed to "conditions" concerning trip-leasing and the "collection and distribution of the trip-lease payments." One "condition" is the company's requirement that if a driver contacts the Buffalo terminal to see whether Pyle has a return load, and if there are fewer than three trucks at the terminal, the driver may not trip-lease with another company for twenty-four hours. But drivers do not have to contact the Buffalo terminal at all. Another "condition" is Pyle's prohibition against hold-harmless clauses in trip-leases—clauses which the Regional Director observed might impose liability on Pyle. But insofar as this protection of Pyle's interests might be seen as an indication of control, the evidence is undercut by the Regional Director's own finding that the company has never attempted to enforce the prohibition. As for the finding that Pyle channels the payments for trip-leasing to the owner-operators, it is undisputed that the company remits the amount in full and serves only as a conduit.

■ Finally, the Regional Director found that the company, rather than the owner-operator, bears the risk of nonpayment by a customer. We do not attach the same significance to this finding as does the Board. Even if we did, the evidence in this record does not support the Board's posi-

---

4. The situation might be different if the company made constant changes in the duties of the drivers and if the company alone determined how to adjust compensation in view of these changes. Such activity would help to demonstrate control. *See generally News-Journal Co. v. NLRB, supra,* 447 F.2d at 67.

tion. In support of its finding, the Board cites two passages from the record. These passages do not contain evidence that the company carries the risk of nonpayment,[5] and other testimony indicates that no customer has ever failed to pay. The owner-operators, on the other hand, accept the entrepreneurial risk that their revenues will not meet their expenses of operation. Although Pyle will advance $75 to the owner-operators, the company contributes nothing toward the owner-operators' payment of expenses. The owner-operators also have the entrepreneurial risk associated with the capital investment in their trucks.

In sum, the considerations on which the Regional Director relied do not provide substantial evidence that the owner-operators are employees, and in the NLRB's treatment of the statutory exemption, the Board's " 'application of the law to the facts overlooked accepted principles of the law of agency . . . .' " *Brown v. NLRB, supra,* 462 F.2d at 702, *quoting Carnation Co. v. NLRB,* 429 F.2d 1130, 1134 (9th Cir. 1970). The owner-operators are independent contractors.[6]

The Supreme Court's decision in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1945), supports this conclusion. In *Silk* the Court had to rule, for the purposes of the Social Security Act, whether certain workers were independent contractors or whether they were employees, from whom the employer would have to collect social security taxes.[7] The critical facts in

5. The two passages are drawn from the examination of owner-operator Edward P. Eggert. The second passage makes clear that Eggert did not know who bore the risk of nonpayment:

Q. What happens in a situation, or if the situation happens where teh [sic] consignee fails to pay for what you deliver?

A. I don't know. I have no idea.

Q. Actually you're paid for that load before Duie Pyle, to the best of your knowledge receives payment from the customer, is that correct?

(Colloquy omitted.)

HEARING OFFICER: I'll let him answer the question. Can you answer that question, to the best of your knowledge?

WITNESS: To the best of my knowledge, I get paid every week. Like I said, if I deliver a load on Monday and I meet the mail truck by 2:00 o'clock in the afternoon, I got paid for that load Thursday, yes. Whether Duie Pyle got paid for it or not, I don't know.

6. In its brief, the Board contends that the company's power to cancel the lease was a means by which it exercised control over the owner-operators. There is no evidence that the company so used the power of cancellation, and the Regional Director did not advance this argument in his decision. Moreover, absent other circumstances, cancellation of the lease goes to the general relationship of the parties, not to control over the operations of the owner-operators.

7. At first sight, the question in *Silk* may appear different from the decision to be made here under the labor laws. In *Silk* the Court interpreted "employee" so as to further the purposes of the Social Security Act, and it did not find itself bound by the meaning of the term in agency law. The Court cited as analogous the inquiry outlined in its labor law decision in *NLRB v. Hearst Publications,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). But Congress, which the decision in *Hearst* had evidently displeased, later reversed *Hearst* by enacting the very exclusion for "independent contractors" around which this case revolves. Congress intended that decisions concerning "employees" and "independent contractors" should, under the labor laws, follow the principles of the common law of agency. *See NLRB v. United Insurance Co., supra,* 390 U.S. at 256, 88 S.Ct. 988. To apply *Silk* in the instant case is therefore to treat the Court's decision as if it rested on the common law meaning of "employee" and "independent contractor," even though the opinion explicitly anchors itself in the policies of the Social Security Act.

Nevertheless, this history does not empty *Silk* of its meaning for labor law. First, the specific statutory policy identified by the Court for application in *Silk* was the purpose of making the Act comprehensive. To be within the Act, a worker would have to be an employee. The term "employee" in the Act was consequently to be read broadly. *Id.* 331 U.S. at 712, 67 S.Ct. at 1467. If, despite this policy, *Silk* supports a holding that the drivers here are independent contractors, the focus in *Silk* on the purpose of the Social Security Act would make the determination under the labor laws an *a fortiori* case. Second, *Silk* reserved a place for the common law of agency; it made that law pertinent but not conclusive. *Id.* at 714, 716, 67 S.Ct. at 1468, 1469. Third, circuit courts, including this one, have regarded *Silk* as applicable to the labor law question raised in this case. *Steel City Transport v. NLRB, supra,* 389 F.2d at 738; *Merchants Home Delivery Service, Inc. v. NLRB, supra,* 580 F.2d at 975–76 (*Silk* held controlling); *National Van Lines v. NLRB,* 273 F.2d 402, 407 (7th Cir. 1960).

*Silk* bear a striking similarity to those in this case. The Court recounted the facts in *Silk* as follows:

Respondent owns no trucks himself but contracts with workers who own their own trucks to deliver coal at a uniform price per ton. This is paid to the trucker by the respondent out of the price he receives for the coal from the customer. When an order for coal is taken in the company office, a bell is rung which rings in the building used by the truckers. The truckers have voluntarily adopted a call list upon which their names come up in turn, and the top man on the list has an opportunity to deliver the coal ordered. The truckers are not instructed how to do their jobs, but are merely given a ticket telling them where the coal is to be delivered and whether the charge is to be collected or not. Any damage caused by them is paid for by the company. The District Court found that the truckers could and often did refuse to make a delivery without penalty. Further, the court found that the truckers may come and go as they please and frequently did leave the premises without permission. They may and did haul for others when they pleased. They pay all the expenses of operating their trucks, and furnish extra help necessary to the delivery of the coal and all equipment except the yard storage bins. No record is kept of their time. They are paid after each trip, at the end of the day or at the end of the week, as they request.

331 U.S. at 706–07, 67 S.Ct. at 1465. The Court in *Silk* held that the drivers were independent contractors. The NLRB has not succeeded in distinguishing the case. In its reply brief, the Board takes the position that the owner-operators here, unlike those in *Silk*, will suffer a penalty if they refuse to make a delivery. But on only one isolated occasion did the company discipline a driver for refusing a delivery. The Board also tries to distinguish *Silk* on a second ground: the drivers in *Silk* could haul for others when they pleased. In the instant case, the owner-operators also may haul for others when they please. For the reasons already elaborated, we cannot accept that either Pyle's policy concerning the Buffalo terminal or its prohibition against hold-harmless clauses inhibits the owner-operators' capacity to haul for other companies.

It should be noted that the truckers in *Silk* received "a uniform price per ton." *Silk* thus casts further doubt on the Regional Director's conclusion that the uniform rate of compensation in Pyle's leases (75 percent of total revenues) is inconsistent with "the arm's length relationship characteristic of a true independent contractorship . . .."

As against the significant factors to which we have adverted, we are persuaded that the isolated incidents referred to by Judge Higginbotham's dissent do not provide a basis for saying that the Board has chosen between "two fairly conflicting views."[8] *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 488, 71 S.Ct. at 464. The Board has instead adopted a position unsupported by substantial evidence. Examining this record, "including the body of evidence opposed to the Board's view," *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 488, 71 S.Ct. at 465, and recognizing that the Board has misapplied the statutory exemption for independent contractors, we hold that the Board's bargaining order, which is unsupported by substantial evidence, may not be enforced.

The petition for enforcement will be denied. Costs taxed against the petitioner.

8. The dissent relies heavily on two or three isolated episodes, from which it draws an inference of control. As Judge Friendly has noted in a decision determining that distributors were independent contractors and not employees, a reviewing court is not required to treat insignificant indications of control as if they constituted substantial evidence:

We cannot say that here the Board ha[s] no basis for its conclusion. But *Universal Camera*, as implemented in this area by *United Insurance*, could not have meant to extend immunity from judicial review that far; to do so would run counter to the whole thrust of that important opinion as to the new "mood" concerning judicial review, 340 U.S. 487, 71 S.Ct. 456, which Congress carried into the Taft-Hartley Act and the APA.

*Lorenz Schneider Co., Inc. v. NLRB*, 517 F.2d 445, 452 (2d Cir. 1975).

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

The determination, in any one case, of whether a worker is an employee or an independent contractor is often a difficult and perplexing one. This issue in general, and with respect to the trucking context in particular, has been addressed in numerous cases by the National Labor Relations Board (the Board), the Courts of Appeals and by the Supreme Court. These cases reveal that, although a large array of factors enter into the decisionmaking process, no bright lines demarcate the employee from the independent contractor. "[T]here is no shorthand formula or magic phrase that can be applied to find the answer." *N.L.R.B. v. United Insurance Co. of America*, 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Thus, the resolution of this issue must be accomplished on a case-by-case basis. As a result, different conclusions are bound to be made on the basis of often similar facts. As with many other equally difficult questions in the field of labor law, Congress has entrusted the Board with the primary obligation of applying the law to the facts of specific cases. A reviewing court must uphold the Board's determination if supported by substantial evidence upon considering the record as a whole. *Id.* Where there are two "fairly conflicting views," a court must defer to the Board even if the court would be inclined to adopt the opposite view. *Id.* That the Board has no special expertise in applying the agency principles that control the determination here does not alter this standard of review or lessen the deference that a court must pay to the Board's judgment. In fact, it is in contexts such as this, where the Board hears the evidence and sifts the facts and where the individual and often unique facts of each case are so crucial, that deference to the Board's determinations, if supported by substantial evidence, is most crucial to a proper functioning of the administrative process that Congress has created.

I would agree that the view that the owner-operators here are independent contractors is a fairly supportable one, but I would insist that the view adopted by the Board is also a fair application of the relevant law to the facts of this case and that its view is supported by more than substantial evidence. Therefore, I would enforce the Board's order and I, accordingly, dissent from the majority's denial of the application for enforcement.

Both parties agree that common law agency principles and, more specifically, the "right of control" test, are to be applied in making the determination of whether a worker is an employee or independent contractor. This is the test that the Board applied. Thus, the question is whether there is *substantial* evidence supporting the finding that A. Duie Pyle, Inc. (Pyle) exercised *sufficient* control over its owner-operators to establish an employer-employee relationship.

In analyzing the various types of control exercised by the owner-operators, it is useful to distinguish between those forms of control required by law and those forms of control that Pyle exercises by its own choice. The interstate trucking industry is subject to extensive regulation both by the Department of Transportation and the Interstate Commerce Commission. Pursuant to such regulations, Pyle is responsible for the "exclusive possession, control, and use" of the trucking equipment it leases from the owner-operators. Pyle must provide public liability and property damage insurance covering the equipment while it is being operated on the company's behalf. Drivers must file an application for employment and pass a physical examination, a road test and a written test before they can drive. Pyle must maintain these records as well as each operator's driving record. In addition, Pyle must inspect and maintain all its vehicles and keep records of such maintenance. As a result Pyle employs a safety inspector and requires vehicles to be inspected prior to leasing and every thirty days thereafter. On at least one occasion Pyle's safety inspector refused to allow an owner-operator to haul his load until repairs were made. The owner-operators must also place Pyle decals on their trucks to indicate the lease relationship.

Pyle argues that, since the above forms of control are mandated by law and are thereby involuntary, they should not be considered significant. This court, however, has already held to the contrary. In *Steel City Transport, Inc. v. N.L.R.B.*, 389 F.2d 735, 738–39 (3d Cir. 1968), we stated:

Petitioner contends that many of the factors relied upon as showing its right of control were based on requirements of the Interstate Commerce Commission's regulations. Certainly this is so as to several such factors, but we think they were a relevant part of the totality of circumstances from which the "employee" determination was properly made. They were by no means "artificial" factors. Rather they had direct and important consequences on the safety and efficiency of the petitioner's operation.

The Board does not, however, rely solely on the forms of control required by law. Although Pyle purported to place no restrictions, other than those necessary to comply with government regulations, on who would drive the trucks it leased, the record reveals that, in one instance, an owner of a truck was told that Pyle would not lease his truck if he used the driver he intended to use. That driver was characterized as a "troublemaker." Although Pyle argues that the record does not establish that this driver was otherwise "qualified," the record does show that the owner of the truck stated that he was qualified and that Pyle's rejection was not based on a lack of qualifications.

Furthermore, although Pyle insists that drivers have an unconditional right to refuse loads without penalty, on at least one occasion, Pyle's dispatcher refused to load a driver who had shortly before refused a load. Pyle replies that this was merely the result of a misunderstanding on the part of the dispatcher who thought that the driver's refusal was calculated to deprive the dispatcher of the opportunity to ship that particular load thereby depriving the dispatcher of his commission. In addition, Pyle characterizes this disagreement, as well as the refusal to lease the truck driven by the allegedly troublemaking driver as isolated ones and contends that, as a matter

of normal procedure, it makes no attempt to discipline its drivers.

The point, however, is that Pyle has reserved the right to both refuse to lease trucks driven by drivers of whom it disapproves and to discipline the drivers of trucks it has leased. That Pyle has not often found it necessary to exercise such powers is beside the point. Good professional truckers, like good children, may seldom need disciplining, but this does not mean that trucking companies and parents do not exercise control over them as a result of the threat of such discipline. "Under the control test, the right of control, even if unexercised, is the crucial element." *N.L.R.B. v. Deaton*, 502 F.2d 1221, 1227 (5th Cir. 1974), *cert. denied.*, 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975). The two incidents just described clearly show that Pyle has retained the "right of control" over its drivers' conduct. An employer's retention of the right to discipline its workers is a significant indicium of an employer-employee relationship. *See, e. g., Aetna Freight Lines, Inc. v. N.L.R.B.*, 520 F.2d 928 (6th Cir. 1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 314 (1976).

Pyle also exercises control beyond that required by law in several other respects. Although drivers are generally free to trip-lease, the company has placed some restrictions on trip-leasing. Pyle, in order to avoid increasing its own liability, has issued a notice forbidding its drivers from signing trip-lease contracts containing "hold harmless" clauses, which remove any risk of loss or damage caused by the owner-operator from the other carrier. Although the record does not reveal any action by Pyle to enforce this policy, the critical point remains that it has asserted its "right of control" over yet another aspect of its drivers' conduct. Also, at Pyle's Buffalo terminal, another restriction is imposed on drivers. If drivers want to carry a return load of Pyle's, they must wait for twenty-four hours if there are less than three trucks awaiting shipment. Pyle, not its drivers, decides whether to bill customers for excessive time spent awaiting a load or for trucks that are ordered but not used. It also handles complaints concerning its driv-

ers such as claims for damaged cargo. Drivers buy their bobtail insurance, which covers drivers' liability when their equipment is not being used by the company, through Pyle. Pyle also makes cash advances to the drivers of up to seventy-five dollars per load.

Thus, this record reveals that Pyle exercises significant control over its drivers and their equipment pursuant to Federal regulation. In addition, Pyle has both retained and exercised the right to control the conduct of its drivers both through the refusal to hire and through the imposition of disciplinary measures. Pyle also exercises control over its drivers in a number of other ways, such as its restrictions on trip-leasing.

With this abundance of record support for the Board's finding, it is difficult for me to perceive how it can be said that the Board has not chosen between two "fairly conflicting views" and that the Board's view is not supported by substantial evidence. I realize that it is tempting for judges to substitute their views for those of the Board, especially where the application of common law principles is involved, but, on this record, I believe the proper exercise of the judicial role would be to defer to the Board's amply supported conclusion and grant its application for enforcement.