ALLBRITTON COMMUNICATIONS COMPANY, the News Printing Company, Inc. and the Hudson Dispatch, Petitioners, No. 84–3438,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Newark Typographical Union No. 103, International Typographical Union, AFL–CIO, Intervenor.

ALLBRITTON COMMUNICATIONS COMPANY, the News Printing Company, Inc. and the Hudson Dispatch, Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner, No. 84–3620,

Newark Typographical Union No. 103, International Typographical Union, AFL–CIO, Intervenor.

NEWARK TYPOGRAPHICAL UNION NO. 103, International Typographical Union, AFL–CIO, Petitioner, No. 84–3676,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Allbritton Communications Company, the News Printing Company, Inc. and the Hudson Dispatch, Intervenors.

Nos. 84–3438, 84–3620 and 84–3676.

United States Court of Appeals, Third Circuit.

Argued June 18, 1985.

Decided July 8, 1985.

Rehearing and Rehearing En Banc Denied Sept. 3, 1985.

dropping a tool or some building materials onto his head, is irrelevant.

Frank C. Sabatino, Schnader, Harrison, Segan and Lewis, Philadelphia, Pa.; Richard W. Beckler (argued), Carl W. Vogt, David M. Foster, Stephen M. McNabb, Fulbright & Jaworski, Washington, D.C., for petitioners in No. 84–3438.

Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman, Jerrold Jay Wohlgemuth (argued), N.L.R.B., Washington, D.C., for petitioner in No. 84–3620.

Sally M. Armstrong, Brian A. Powers (argued), O'Donoghue and O'Donoghue, Washington, D.C., Jack Wysoker, Mandel, Wysoker, Sherman, Glassner & Weingart-

ner, New Brunswick, N.J., for petitioners in No. 84–3676.

Before ALDISERT, Chief Judge, GIBBONS, Circuit Judge, and DIAMOND, District Judge.[*]

## OPINION OF THE COURT

ALDISERT, Chief Judge.

This review of a decision of the National Labor Relations Board requires us to examine contentions raised in separate petitions for review presented by an employer and a union, and the justification for the Board's action contained in the Board's application for an enforcement order. We must decide whether substantial evidence supports the Board's findings that (1) the News Printing Company, Inc. was the employer of the employees of T & T, Inc.; (2) economic reasons motivated the dismissal of eight editorial employees; (3) the Company did not fail to bargain in good faith with Local 103 of the International Typographical Union; and (4) the News Printing Company, Inc. reasonably filed a civil action against employees who had claimed workmen's compensation benefits. We hold that the Board's findings were supported by substantial evidence and therefore grant the application for enforcement of its order.

### I.

The News Printing Company, Inc. and Hudson Dispatch are wholly owned subsidiaries of Allbritton Communications Company. The Board has previously found these entities to comprise a single employer (the Company). This finding is uncontested. There are two unions involved: the Newspaper and Mail Deliverers Union of New York and Vicinity (NMDU) and the Typographical Union No. 103, International Typographical Union, AFL–CIO (Local 103, ITU or the Union).

The events underlying this action occurred in 1980–81. Four distinct but related sets of facts give rise to the issues we must decide.

### A.

The News contracted in 1966 with T & T, Inc. for T & T to handle The News's mailroom and delivery functions. Allbritton assumed this contract when it purchased The News in 1977. T & T employed workers represented by the NMDU to carry out the mailroom functions, which involved removing the printed newspapers from a conveyor belt in the mailroom, packaging the papers for delivery, placing advertising supplements in each bundle (topping) when necessary, loading the delivery trucks, and delivering the papers to retail stores and "drop" locations for distribution to deliverers. Peter Trombina, one of the owners of T & T, periodically negotiated and signed collective bargaining agreements between T & T and the NMDU. In October 1980, the Company and Trombina agreed that he would seek NMDU's approval of a Company proposal to consolidate delivery routes and reduce the size of T & T's work force. Under the terms of the proposal, the Company would pay any severance money owed T & T employees and would reimburse T & T for any legal fees incurred because of the proposal. The NMDU rejected the Company's proposal and the Company hired new employees to carry out the mailroom and delivery job functions of T & T. The Company denied Trombina and his employees access to The News's mailroom. The T & T employees have remained out of work since February 9, 1981.

### B.

Since its purchase of The News and The Dispatch in 1977, Allbritton Communications Company had, by 1980, advanced over $2,500,000 to the News to compensate for operating losses. The News, however, still was not a profitable enterprise by July 1980. In August 1980, W. Dean Singleton,

[*] Honorable Gustave Diamond, of the United States District Court for the Western District of Pennsylvania, sitting by designation.

president of The News and The Dispatch, directed executive editor Richard Vezza to reduce the size of the editorial staffs of The Dispatch and The News through attrition. Vezza did not heed Singleton's directive and instead hired additional reporters in September and October. On October 24, 1980, Singleton learned the editorial staffs had not been reduced and ordered Vezza to cut the staff at The Dispatch from 44 to 40 employees and the staff at The News from 51 to 46. Eight editorial employees were then dismissed. Throughout this entire time period, and particularly in October 1980, Local 103 was attempting to unionize the editorial room employees.

### C.

The composing room employees at The News were represented by Local 103. In December 1980, negotiations began between the Company and Local 103 for a new contract, because the then existing contract was due to expire on January 25, 1981. In November 1980, prior to formal negotiations, Singleton met with the president of Local 103 and informed him The News was in serious financial difficulty and would need to save approximately $35.00 per week for each composing room employee. The Company initially proposed a 15 percent wage cut ($51.00 per employee), an increase in straight-time working hours to a 40-hour work week, and a decrease in personal leave days from 10 to 5. The Union initially proposed an increase in overtime pay and an increase in paid holidays. The membership of Local 103 unanimously rejected the Company's proposal to decrease wages, and this rejection was communicated to the Company at one of the December bargaining sessions.

On January 14, the Company presented its "bottom line" position to the Union: a $35.00 per week cut for each composing room employee, taken in any combination of wages, fringe benefits, and personal days. On January 29, Singleton informed the Union that an agreement on cost reduction must be reached by February 10, and that he felt the negotiations were nearing

impasse. On February 3, Singleton informed the vice president of the ITU that the Company was going to post its final offer of a $35.00 per employee per week cost reduction on February 6 and would implement the reduction on February 10 if no agreement were reached.

On February 6, a bargaining session took place in the presence of a federal mediator. At this session Singleton proposed a three year contract, with a $35.00 cut the first year, a restoration of the cut the second year, and a $29.50 increase for the third year. The Union rejected the offer. On the same day, February 6, the Company posted a notice in the composing room stating that wages would be cut $35.00 per week effective February 10, and all other conditions would remain unchanged. The Union accepted the posted conditions on February 9, pending negotiation of a new agreement. However, the composing room employees did not return to work because that same night, February 9, the NMDU began picketing The News because of the Company's action in hiring replacement mailroom and driver employees and members of the Local 103 honored the picket line. On February 10 the Company notified the striking composing room employees that they would be permanently replaced if they did not return to work that afternoon. The employees did not return to work.

The members of Local 103 met on February 13 and voted to strike. Several meetings between the Company and Union took place during the pendency of the strike and the Company reverted to its original offer (15 percent wage cut, increase in straight time, decrease in personal days). A final bargaining session was held on November 17, 1981, without any further progress.

### D.

While they were on strike, all but eight of the composing room employees filed workmen's compensation claims against The News alleging partial disabilities (51 employees filed claims). Most of the claimants filed their petitions on March 14, and

each stated he or she had not received medical treatment for the alleged disability. The Company filed answers to the petitions in August and September 1981. On November 25, the Company filed suit alleging fraud, conspiracy and abuse of process against each of the striking employees because of the mass workmen's compensation filings. On December 10, the Company amended its complaint, deleting as defendants the striking employees who had not filed workmen's compensation claims.

## II.

In response to various charges made by the unions involved, the Regional Director of the NLRB filed an original and two amended complaints against the Company and T & T. Following a consolidated hearing before an Administrative Law Judge (ALJ), the ALJ issued a written opinion to which all parties filed exceptions. After a proceeding before the Board, the Board concluded, in disagreement with the ALJ, that T & T was not an independent contractor but rather an "administrative arm" of the Company and as such T & T's employees were also the Company's employees. Accordingly, the Board found that the actions of the Company in summarily replacing T & T's employees and "locking them out" violated § 8(a)(1), (3) and (5) of the Act, 29 U.S.C. § 158(a)(1), (3) and (5), and ordered reinstatement. The Company petitions for review of this portion of the Board's order. Although the Union's request to intervene in this aspect of the case was granted, the Union did not file an intervenor's brief.

The Board further determined, also in disagreement with the ALJ, that the Company did not violate § 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3), by discharging the editorial employees; the Company did not fail to bargain in good faith with Local 103 representing the composing room employees; and the Company did not violate § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by bringing an action against striking employees who had filed workmen's compensation claims. The Union petitions for review of these findings. The Company has filed a brief as an intervenor.

Our review of the Board's factual findings is, of course, circumscribed. We must sustain the findings if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). When, as here, the Board rejects certain findings made by an ALJ, this "substantial evidence" standard is cast in a special light. The Supreme Court has directed us to recognize that an ALJ's findings of fact constitute a vital part of the whole record that the court must review. These findings "are to be considered along with the consistency and inherent probability of testimony. The significance of his report ... depends largely on the importance of credibility in the particular case." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951). We must "recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Id. Eastern Engineering & Elevator Co. v. NLRB*, 637 F.2d 191, 197 (3d Cir.1980).

Our review of the Board's application of legal precepts to the facts is plenary. *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). The General Counsel has the burden of proving an unfair labor practice allegation by a preponderance of the evidence, *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983), and if he fails to meet this burden the Board is required by § 10(c) to dismiss the allegation. The Board's determination that the General Counsel has failed to meet his burden must be upheld unless the determination has no rational basis in the record. *Ladies Garment Workers v. NLRB*, 463 F.2d 907, 919 (D.C.Cir.1972). We now address the sever-

al contentions advanced by the petitioners, the intervenors, and the Board.

## III.

The Company argues that the Board's determination that The News employed the T & T employees is based on erroneous legal principles. We disagree. Initially, it is important to note that the Company does not contest the Board's determination that an employer violates § 8(a)(1), (3) and (5) of the Act, 29 U.S.C. § 158(a)(1), (3) and (5), if it engages in the type of conduct the Company did here. The dispositive, and contested, issue is whether the Board properly found that the mailroom employees and drivers were employees of The News.

### A.

■ Determination of independent contractor status as opposed to employee status involves an application of common law principles of agency. *NLRB v. United Insurance Co.*, 390 U.S. 254, 258, 88 S.Ct. 988, 990, 19 L.Ed.2d 1083 (1968). The law of agency looks to the degree of control the principal exerts over the details of the agent's performance. *NLRB v. A. Duie Pyle, Inc.*, 606 F.2d 379, 382 (3d Cir.1979) (citing *NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 562 (3d Cir.1962)).

■ This court has explained that the "right to control" test requires an examination of " 'the type of services rendered, the possibility of realizing additional profits through the exercise of entrepreneurial skill and the ownership and maintenance' of equipment." *Duie Pyle*, 606 F.2d at 382 (quoting *News-Journal Co. v. NLRB*, 447 F.2d 65, 68 (3d Cir.1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972)). In determining that the mailroom workers were employees of The News, the Board explicitly applied the right to control test:

> We have concluded that T & T was little more than an administrative arm of the Respondents; the Trombinas were managers employed by the Respondents to operate the delivery system to the Respondents' specifications....

The relationship between the Respondents and T & T exhibited strongly most of the factors commonly associated with agency or employee status. T & T performed functions which were an essential part of the newspaper's operation, had a long-term exclusive working arrangement with the newspaper, carried the newspaper's product in trucks bearing the newspaper's name, conducted its operation under daily guidance from newspaper personnel and subject to unilateral changes dictated by the newspaper, had no proprietary interest in the work or the premises and equipment used to perform it, and had no opportunity to take entrepreneurial risks. See *News-Journal Co. v. NLRB*, 447 F.2d 65 (3d Cir.1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972). Weighed against these factors and the Respondents' direct and indirect participation in labor relations matters, T & T's conduct of the lower-level functions of employee management and dealing with the Union was more akin to the role performed by supervisors than that characteristic of independent contractors.

App. at 1817.

The Company urges that the Board improperly equated agent status with employee status, arguing forcefully that a principal is not the employer of his agent's employees, relying on *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 323, 95 S.Ct. 472, 475, 42 L.Ed.2d 498 (1974). The Court in *Kelley* held that an employee of a trucking company (PMT) was not an employee of a railroad that contracted with PMT. The Court reasoned:

> The District Court found that PMT employees exercised supervision and control over the unloading operations, although the railroad bore the "responsibility" for those functions. On these facts, the District Court was plainly correct in concluding that PMT was an agent of the railroad.... [A] finding of agency is not tantamount to a finding of a master-servant relationship. See Restatement (Second) of Agency § 2. The finding that

the railroad was "responsible" for the unloading operations is significantly weaker than would be a finding that it controlled or had the right to control the physical conduct of the PMT employees in the course of their unloading operations. The railroad would satisfy the District Court's "responsibility" test whenever it agreed to perform a service and subsequently engaged another company to perform that service for it on its premises. The "control or right to control" test, by contrast, would be met only if it were shown that the role of the second company was that of a conventional common-law servant.

*Id.* at 325–26, 95 S.Ct. at 476–477.

The fatal flaw in the Company's contention is that here the Board did not find that the Company bore mere "responsibility" for the mailroom operations. Rather, the Board properly applied the "right to control test" and found that the Company exercised significant control over the conduct of T & T and its employees. The Company thus loses the *Kelley*-based major premise of its argument. The Board concluded that T & T was an "administrative arm" of The News, or, in the words of the *Kelley* Court "a conventional common-law servant." *Id.* at 326, 95 S.Ct. at 477. Viewed as such, the mailroom employees were subservants of T & T which in turn was a servant of the Company, thereby rendering the Company the statutory employer of the NMDU workers. *See id.* at 324, 95 S.Ct. at 476. This finding does not run afoul of the teachings of *Kelley* and it is supported by the following substantial evidence:

(1) The costs of establishing T & T were paid for by The News. App. at 922–30, 529.

(2) The Company provided T & T with its delivery trucks and paid for all of their operating expenses. The Company also provided free office space to T & T and provided all of the office equipment and telephone service. App. at 406–07, 726–30, 1127–33.

(3) The Company established the number of T & T employees to work each shift and retained the right to require T & T to hire additional employees, and also retained the right to demand that T & T discharge any driver, supervisor or assistant foreman who did not meet the Company's approval. App. at 411–13, 457–59, 528–29, 640, 1128–30, 1132–33.

(4) The Company established T & T's employees' work schedules and the routes and schedules for the drivers. T & T had no customers of its own. All orders from retail outlets came through the Company. App. at 407–10, 429, 457–58, 460–63, 465–68, 1127–33.

(5) The Company paid T & T a weekly amount that covered the employees' salaries and fringe benefits and all the operating expenses of T & T. The Company agreed that these weekly payments would be increased whenever required by the T & T–NMDU contract. App. at 475, 508–19, 526–27, 534–35, 544–46, 637–41, 734–36, 805, 856–57, 863, 1125–30, 1134, 1220–21.

(6) Before Trombina would negotiate a contract with NMDU on behalf of T & T, he would seek the approval of The News. App. at 331–35, 388–99, 435–51, 519–22, 1088–1112, 1124, 1160–63.

(7) The Company handled T & T's employees' grievances regarding the mailroom and delivery trucks. App. at 365–66, 397–99, 560–64.

### B.

The Company further argues that principles of collateral estoppel preclude the Board's finding that The News employed the mailroom workers and drivers. Following the Company's replacement of the NMDU workers, these workers began picketing The News's facilities. The Company filed suit in New Jersey state court, seeking to enjoin acts of alleged violence by the picketers. The NMDU removed the case to the United States District Court and filed a counterclaim under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. In adjudicating the counterclaim, District Judge H. Lee Sarokin determined, *inter alia,* that the T & T employees were

not the employees of The News. Judge Sarokin then recused himself and the case was reassigned to Judge Herbert J. Stern. Judge Stern held that the case was improperly removed initially because the original action filed in state court did not "arise under" federal law, a threshold jurisdictional requirement for removal. *See* 28 U.S.C. § 1441(b).

 The rule is well-settled that although removal proceedings are in the nature of process, and thus defects in the removal procedure are waivable, an absolute nonwaivable requirement is that federal subject matter jurisdiction to adjudicate the dispute exists:

> Longstanding decisions of this Court make clear ... that where after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court.

*Grubbs v. General Electric Credit Corp.,* 405 U.S. 699, 702, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1971). Because Judge Stern determined that the federal district court would not have had original jurisdiction over the Company's suit for an injunction had the case originally been filed in United States District Court, any purported "findings" by Judge Sarokin should not be given collateral estoppel effect.

 Moreover, additional reasons, quite apart from this basic jurisdictional defect, counsel against affording any collateral estoppel effect based on the earlier proceeding before Judge Sarokin. It is well settled that collateral estoppel applies only after a particular issue has been "necessarily determined by a court of competent jurisdiction...." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). We are persuaded that under the circumstances present here, the issue that the Company argues has already been determined—the employment status of T & T's employees—

was not an issue that was necessary to the district court judgment. The only order entered below was Judge Stern's remand order. Clearly, the sole issue relevant to this judgment was the jurisdictional question; any "findings" by Judge Sarokin on the merits of the dispute were simply irrelevant. Accordingly, an essential predicate to the application of collateral estoppel did not exist.

### C.

 Finally, the Company contends that imposing liability on the Company based on an employer relationship with the mailroom workers violates due process. The Company reasons that since it has never been certified by the Board as the employer of the NMDU workers, the Board cannot now so find an employer-employee relationship. We find this argument unpersuasive.

When Allbritton purchased The News in 1977, The News asserted effective control over T & T and the mailroom employees, acting as their employer for purposes of the National Labor Relations Act. The News cannot now be heard to complain that the concomitant burden accompanying this employer-employee relationship—the duty to negotiate and abide by the terms of the existing collective bargaining agreement—violates due process.

### IV.

 The Union argues that the Company's discharge of the editorial employees resulted from union animus and therefore was in violation of § 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3). The General Counsel bears the burden of proving that an employee's protected conduct was a "substantial or motivating factor" leading to his dismissal. *NLRB v. Transportation Management Corp.,* 462 U.S. at 401–02, 103 S.Ct. at 2474, 2475. However, if the General Counsel meets this burden, the "employer [may] avoid being adjudicated a violator by showing what his actions would have been regardless of his

forbidden motivation." *Id.* Here, the Board concluded that the General Counsel failed to discharge the initial critical burden, and found that even if the burden had been met, the Company introduced sufficient evidence showing the dismissals resulted from a permissible motive. App. at 1822–23. The Board's finding that economic considerations were the motivating factor in the dismissals is supported by substantial evidence:

(1) Prior to its purchase by Allbritton in 1977, The News had operating deficits and its composing room employees had been forced to grant "givebacks" to help the newspaper. App. at 737–41, 1616. Between 1974–76, the composing room employees agreed to forego two pay increases. App. at 184–85, 322–28.

(2) Between 1977–1981, The News lost almost $2,000,000 and The Dispatch lost nearly $400,000. App. at 746–49, 1617–19.

(3) In 1979, to reduce costs, the composing room operations of The News and The Dispatch were consolidated, allowing a reduction in work force from 125 to 50 employees. App. at 180–83, 310–21.

(4) In 1980, the Company ceased publishing The News's evening edition and laid off additional composing room and editorial employees. App. at 752, 822, 857.

(5) In July 1980, tentative plans were formed to close The News's operations completely. Singleton persuaded Allbritton to allow him one last chance to save the newspaper. App. at 751–52.

(6) In August 1980, Singleton directed executive editor Vezza to reduce the size of the editorial staffs at both newspapers to bring the staffs' sizes within industry guidelines. At this time, according to these guidelines, The News was overstaffed by five editorial employees and The Dispatch by four. App. 680–85, 717–18.

(7) Vezza did not abide by the directive from Singleton and did not allow the editorial staff to be reduced by attrition but rather hired additional employees. App. at 680–84, 707–09, 714–22, 752–53.

(8) On October 24, 1980, Singleton learned that Vezza had reduced the editorial staff by one one or two employees. Singleton ordered Vezza to cut the staffs immediately at The Dispatch from 44 to 40 and at The News from 51 to 46 employees. Singleton instructed Vezza to effectuate the dismissals that same day. App. at 683–84.

(9) Four employees at The Dispatch were laid off: Rubin, Neustadt, Goldensohn, and Ensslin. App. at 684–87. Neustadt and Goldensohn had worked at the newspaper for less than six months and Rubin was on probation for poor workmanship. App. at 85, 99, 105, 174.

(10) Four employees at The News were laid off: Vogel, Duhl, Fischer, and McDonnell. Vogel had worked at the paper for less than six months. App. at 114, 118, 706. Duhl, Fischer and McDonnell were chosen to be laid off based on personality, attitude toward the job, and interpersonal relationship factors. App. at 43–46, 64–65, 78–79, 212, 244, 250–51, 693–94, 696. Additionally, Fischer had poor workmanship. App. at 247–49, 690–91.

The above evidence supports the Board's finding that economic reasons underlay the dismissals. In arguing that the Board erred, the Union relies on evidence that the timing of the dismissals coincided roughly with the filing of a representation petition, that three of the discharged employees were union organizers and that several instances of anti-union statements made by supervisory personnel in the editorial room occurred. The Board did not ignore this evidence:

[W]e find that the evidence of the Respondent's union animus and the suspicious coincidence between the Respondent's actions and the ITU's organization campaign do not establish that the latter was a motivating factor for the former. . . . The record taken as a whole gives us insufficient basis to choose the unlawful motive over the lawful one. . . .

App. at 1822. Our standard of review is thus dispositive. We may not "displace the Board's choice between two fairly conflicting views, even though the court could justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

### V.

■ The Union argues that the totality of the circumstances demonstrates that the Company did not bargain in good faith with the composing room employees. We do not agree. The record contains substantial evidence supporting the Board's conclusion that the Company bargained in good faith.

■ Section 8(d) of the Act, 29 U.S.C. § 158(d), requires that parties bargain with "a real desire to come into agreement." *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). The statute does not compel "either party to agree to a proposal or require the making of a concession," *NLRB v. American Insurance Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1951), nor may the Board "control[ ] the settling of the terms of collective bargaining agreements." *Struthers Wells Corp. v. NLRB*, 721 F.2d 465, 470 (3d Cir. 1983) (citing *NLRB v. Insurance Agents' International Union*, 361 U.S. at 487, 80 S.Ct. at 426).

The Union points to various events evidenced in the record and argues this evidence compels a finding of bad faith. The Union cites the hard line bargaining posture taken by the Company, statements by Singleton, president of The News and Dispatch, that if the employees did not accept a pay cut "they don't work here anymore," app. at 135, and "I don't give a damn about people anymore ... any printer, driver or pressman who gets in my way, I'll roll right over him" *id.*, and the unlawful "locking out" of T & T and its employees. The Union also argues that no impasse had been reached and the Company's unilateral implementation of its final wage offer thus violated § 8(a)(5). Indeed, evidence exists in the record from which one could reasonably draw an inference of bad faith. That evidence, however, does not compel us to draw such an inference. "Although we ... might have reached a different conclusion given the same facts, our power of review is not such that we may ... reverse the decision of the Board as inadequately supported by the evidence." *International Telephone & Telegraph Co. v. NLRB*, 382 F.2d 366, 373 (3d Cir.1967). Our inquiry turns, then, to whether substantial evidence exists to support the Board's finding of no bad faith. The record contains such evidence:

(1) The Company willingly participated in negotiations at the first session on December 2, 1980. The News explained its financial condition and presented its first proposal. App. at 126–27, 186.

(2) At the second session The News offered to show the paper's financial records to the Union; the Union declined the offer. App. at 190, 211–12, 658–59, 776–77. At this session, The News also requested that a representative from the ITU participate. App. at 139–40, 201, 826. The Union did not think the presence of an ITU representative was necessary. App. at 660.

(3) The parties met on December 17. The News again stressed its dire financial problems. App. at 660–61.

(4) The parties met on January 14. The News presented its bottom line, upon request of the Union. The Union made no counterproposal. App. at 131–133, 662–66, 755–57.

(5) The parties met on January 29. This was five days after the News-Union contract had expired. App. at 133–34. No progress was made.

(6) The parties met on February 6 with a federal mediator present at The News's request. At this session The News offered a three year—rather than one year—contract which set a pay cut in the first year, a restoration of the cut in the second year and a pay raise in the third year. The Union rejected the offer.

App. at 138, 215–16, 667–68, 830. At this session Singleton determined the parties were deadlocked. He said he would post the conditions under which composing room employees would work until a new contract was signed. He said The News would continue to negotiate until a final agreement was reached. App. at 202, 205, 329, 830–31.

This record evidence supports a reasonable inference that the Company entertained "a real desire to come into agreement." *NLRB v. Insurance Agents' International Union,* 361 U.S. at 498, 80 S.Ct. at 432. Furthermore, it supports the Board's finding that the parties had reached an impasse after two months of negotiations on wage provisions. *See* app. at 1827. The Company, therefore, lawfully could implement the proposal that it had submitted to, and which was rejected by, the Union.

## VI.

■ Finally, the Union argues that the suit alleging fraud and conspiracy filed against striking composing room employees was an attempt to interfere with their § 7 rights and therefore violated § 8(a)(1), 29 U.S.C. § 158(a)(1). We find no error in the Board's treatment of this issue.

■ It is not an unfair labor practice for an employer to bring an action against its employees if the lawsuit has a reasonable basis, "even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1982). The Board determined that the Company did not harbor an unlawful motive in filing the suit. This finding is supported by substantial evidence.

The workmen's compensation claims were filed en masse. *See* app. at 1250–1360. All but one of the claims alleged disability based on impurities in the air in the workplace. *Id.* (The single exception alleged disability based on exposure to "loud noises" in the work place). Each

claimant acknowledged that he/she had not sought medical treatment for the alleged disability. *Id.* The Company filed answers to the claims and did not file suit until four months after the claims were filed. The Board did not err in finding that the Company reasonably could have perceived that the mass filing of claims was harrassment by the Union and constituted grounds for a civil action.

## VII.

The petitions for review will be denied and the application for enforcement of the Board's order will be granted.