**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DEATON, INC., Respondent.**

No. 73-3084.

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1974.

As Corrected On Rehearing and Rehearing En Banc Denied Jan. 15, 1975.

examine the validity of a 1971 representation proceeding order designating a bargaining unit of employees of Deaton, Inc., an irregular route interstate common carrier.[1] The heart of the case is the question of whether drivers of trucks owned by others and leased to Deaton were properly included in the unit. We conclude that in the 1971 order the Board did not employ improper legal standards and its findings are supported by substantial evidence. Thus the 1973 order directing Deaton to bargain must be enforced.

Independent contractors are excluded from the coverage of the National Labor Relations Act, 29 U.S.C. § 152(3), and a bargaining unit lumping them with "employees" is inappropriate. In the representation proceeding the Board designated as an appropriate unit of employees of Deaton:

> All over-the-road truckdrivers, city pickup and delivery drivers, hostelers, and maintenance employees at the Employer's Birmingham, Alabama, plant, excluding all office clerical employees, salesmen, guards, and supervisors as defined in the Act.

The Board opinion, 187 N.L.R.B. No. 102, 76 L.R.R.M. 1129, summarized in 1971 CCH NLRB ¶ 22,635 (Jan. 11, 1971), shows that "over-the-road truckdrivers" included these subgroups:

> Drivers of Deaton-owned trucks, conceded to be "employees."

> Single-truck owner-drivers. A single-truck owner-driver owns only one truck, which he leases to Deaton and drives himself.

> Nonowner drivers. A nonowner driver drives a truck leased to Deaton by a third person.[2]

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., Walter C. Phillips, Director, Region 10, N. L. R. B., Atlanta, Ga., William R. Stewart, Washington, D. C., for petitioner.

Mark Taliaferro, Sr., Mark Taliaferro, Jr., C. V. Stelzenmuller, Birmingham, Ala., for respondent.

Before BROWN, Chief Judge, and GODBOLD and RONEY, Circuit Judges.

GODBOLD, Circuit Judge:

This National Labor Relations Board refusal to bargain case requires us to

---

1. As usual, the issue of the validity of the representation proceeding order comes before us in the context of a subsequent unfair labor practice case in which, in 1973, the Board held Deaton guilty of refusal to bargain with Service Employees Local 623, AFL–CIO, the duly elected and certified representative of the unit. *See* 203 N.L.R.B. No. 172, 83 L.R.R.M. 1294, summarized in 1973 CCH NLRB ¶ 25,421 (June 1, 1973).

2. The third person owns two or more trucks. Often he drives one himself, while the other(s) are driven by nonowner drivers. The Board decision referred to such third persons in the aggregate as "multiple-owner drivers," and excluded them from the unit upon the ground that they are supervisors.

The drivers of Deaton-owned trucks number 35 to 50. Around 350 trucks are leased to Deaton. The record does not show how

Deaton urges that the unit is inappropriate because single-truck owner-drivers are independent contractors. Nonowner drivers are conceded to be employees, but Deaton claims that multiple-owner drivers are independent contractors, and that they [i. e., the multiple-owner drivers] rather than Deaton are the employers of the nonowner drivers.[3]

■■ The Act does not define independent contractor. The Board and the courts flesh out the term by application of common law agency principles. NLRB v. United Ins. Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). The determination of a worker's status involves no special expertise peculiar to the Board. But when made by the Board in the first instance under correct principles and following briefs, oral argument, and a hearing with witnesses, the determination should not be set aside merely because the court of appeals would, as an original matter, decide the case the other way. The court must canvass the entire record in the search for substantial evidence and must not displace the Board's choice be-

tween two fairly conflicting views. *Id.* at 260, 88 S.Ct. 988, 19 L.Ed.2d at 1088, citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

While asserting that agency principles are applicable, the Supreme Court has made clear that there is no shorthand formula or magic phrase that yields easy answers in close cases. NLRB v. United Ins. Co., *supra,* 390 U. S. at 258, 88 S.Ct. 988, 19 L.Ed.2d at 1087. Rather, all incidents of the relationship between the worker and the company must be assessed and weighed. The resultant decision is "not a purely factual finding . . . but involve[s] the application of law to facts. . . ." *Id.* at 260, 88 S.Ct. at 991, 19 L.Ed.2d at 1088.

■ Our own employee-independent contractor cases,[4] Board decisions [5] and cases from other circuits [6] have refined the agency law inquiry. The "control test," which we will discuss more fully *infra,* has emerged as an important desideratum. It is not, however, the sole analytical tool.[7] The Board opinion in

many of these are driven by single-truck owner-drivers and how many by nonowner drivers or multiple-owner drivers.

3. The status of single-truck owner-drivers is stated as a separate issue, but at all stages of the proceedings the parties and the Board have not differentiated it from the issue of nonowner drivers' status. Thus everyone has assumed that if nonowner drivers are employees, single-truck owner-drivers perforce are employees too. That assumption is justified. The Board opinion concluded that the nonowner drivers were sufficiently under Deaton's control to make them Deaton's employees under common law agency principles. Undergirding the Board's conclusion was the finding that Deaton, through its power to unilaterally cancel multiple-owner drivers' leases, could force them to act as conduits for company control over nonowner-drivers. To the extent Deaton had indirect control over nonowner drivers, it had direct control over single-truck owner-drivers, who were signatories of the uniform lease that multiple-owner drivers signed.

4. *E. g.,* Deaton Truck Line, Inc. v. NLRB, 337 F.2d 697 (CA 5, 1964), cert. denied sub

nom. Teamsters Local 612 v. NLRB, 381 U. S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965) ; NLRB v. Lindsay Newspapers, Inc., 315 F.2d 709 (CA 5, 1963) ; NLRB v. Steinberg, 182 F.2d 850 (CA 5, 1958).

5. *E. g.,* Indiana Refrigerator Lines, Inc., 157 N.L.R.B. No. 29, — L.R.R.M. —, summarized in 1966 CCH NLRB ¶ 20,248 (Mar. 9, 1966) (before the full Board).

6. *E. g.,* NLRB v. Nu-car Carriers, Inc., 189 F.2d 756 (CA 3, 1951) ; NLRB v. Cement Transport, Inc., 490 F.2d 1024 (CA 6, 1974) ; Joint Council of Teamsters No. 42 v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322 (1971) ; Radio City Music Hall Corp. v. United States, 135 F.2d 715 (CA 2, 1943) (tax case; opinion by Learned Hand) ; NLRB v. Jewell Smokeless Coal Corp., 435 F.2d 1270 (CA 4, 1970).

7. *Cf., e. g.,* News-Journal Co. v. NLRB, 447 F.2d 65 (CA 3, 1971), in which the Third Circuit frowned on the Board's practice of expressing its conclusion solely in terms of the control test, but held that the record showed that the Board had in fact given due consideration to other factors.

the present case shows that other factors were weighed. For example, the company's and drivers' own declarations about their relationship, voiced in the governing uniform leases, were considered, as was the fact that the company extends employee-type life and health insurance and pension benefits only to drivers of company-owned trucks, not to single-truck owner-drivers or nonowner drivers.

The dissenting member of the Board panel, Chairman Miller, argued for giving more weight to the entrepreneurial character of the owner-drivers' operations. He cited United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), a Social Security tax case in which the Supreme Court held that certain moving-van drivers had so much responsibility for investment and management that they were independent contractors.

The Board majority considered the extent to which multiple-owner drivers and single-truck owner-drivers are entrepreneurs, investing a substantial amount of cash, bearing the risk of loss, and enjoying the hope of profit. *Silk* itself demonstrated that entrepreneurial indicia are not necessarily to be accorded paramountcy and that the "total situation" must be evaluated. 331 U.S. at 719, 67 S.Ct. 1463, 91 L.Ed. at 1771. Cf. Joint Council of Teamsters No. 42 v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322 (1971) (per curiam) (entrepreneurial indicia are significant primarily because they imply control).

Nearly every case examining the employee-independent contractor distinction involves an alignment of investment and management responsibility departing in some degree from the classic employer-salaried employee model. The various factors bearing on the "total situation" frequently point in conflicting directions. We cannot say that in the present case the board majority gave undue weight to the control test or shortchanged entrepreneurial indicia.

The control test is traditionally stated in the following terms:

[The test focuses on] the nature and the amount of control reserved by the person for whom the work is done . . . [T]he employer-employee relationship exists when the person for whom the work is done has the right to control and direct the work, not only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished . . . [I]t is the right and not the exercise of control which is the determining element.

NLRB v. Phoenix Mutual Life Ins. Co., 167 F.2d 983, 986 (CA7), cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948). The Board and the courts have tended to emphasize particular phrases from the test. For example, numerous decisions have stressed that a company's right to control, even if not exercised, makes workers employees. See, e. g., Deaton Truck Line, Inc. v. NLRB, 337 F.2d 697 (CA5, 1964), cert. denied sub nom. Teamsters Local 612 v. NLRB, 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965) [*Deaton I*]. Also, the distinction between control over manner and means and control over end results has been made to bear considerable weight. Thus in NLRB v. Steinberg, 182 F.2d 850 (CA5, 1958), animal trappers who leased tracts from the company, worked them during a brief season, and sold pelts to the company, were held to be independent contractors because there was no substantial evidence that the company had significant control over the manner and means of accomplishing the production of pelts.

In interstate truck line cases an additional wrinkle on the control test has evolved. The Interstate Commerce Commission and the Department of Transportation closely regulate truck lines. The leading purposes of the regulations are to promote safe operation of trucks and to ensure continuous financial responsibility so that truck-related losses will not go uncompensated. The regulations, designed to protect both the highway-travelling public and the segment of the public directly using trucking serv-

ices, have the effect of requiring the holder of a certificate of public convenience and necessity to possess and exercise considerable control over all trucks operated under the certificate, without regard to whether the holder owns the trucks.[8] Control over trucks involves control over drivers. We agree with the Board that it is unnecessary to decide whether ICC-mandated controls alone would be sufficient to establish the employee status of nonowner drivers of leased trucks. In the present case the Board took into account the substantial nexus of control required by federal regulations and also found that the facts established the existence of "additional controls" voluntarily reserved by Deaton. Thus the Board found that the total controls were sufficient to make out employee status. We follow the same approach. See NLRB v. Pony Trucking, Inc., 486 F.2d 1039 (CA6, 1973).

At the 1970 hearing before the Hearing Examiner, Deaton pointed out the changes in the relationship between the drivers and the company that had intervened since 1963, when in *Deaton I* we agreed with the Board that single-truck owner-drivers and nonowner drivers driving Deaton-leased trucks were employees. The changes, many of which were effected by redrafting the uniform lease, included the following: company-paid vacations and hospital, life and workman's compensation insurance were eliminated for all except drivers of Deaton-owned trucks; the rate of pay for drivers of leased trucks was no longer fixed by the lease, and different multiple-owner drivers offered different pay

rates and fringes; orientation and safety meetings were eliminated and company safety and driver supervision patrol operations curtailed; drivers of leased trucks were no longer reprimanded by Deaton, nor were they required to sign in personally before being dispatched or to follow company-prescribed routes; they were permitted to take extended leaves, to take equipment home, and to purchase fuel and repair and maintenance services and to sojourn overnight wherever they pleased; multiple-owner operators were allowed to lease trucks (other than those already under lease to Deaton) to other carriers, and to swap drivers from Deaton to other carriers; the prohibition against lease drivers' swapping loads so as to get loads consigned in the direction of their homes was lifted; the practice of maintaining a pool of company-approved nonowner drivers upon which multiple-owner drivers were required to draw was eliminated.

The 1971 Board decision took account of the changes but found that considerable control remained vested in Deaton.

The Employer remains obligated to comply with ICC and Department of Transportation regulations relative to the operation of all vehicles used in its operations on the Nation's highways and concededly, exercises the control over operation of leased equipment necessary to assure compliance with said requirements. Furthermore, the Employer, being answerable to its customers for any unsatisfactory performance by a lease operator or his driver, will, in turn, take

---

8. ICC-mandated control over trucks not owned by the carrier was intended by Congress, which authorized the Commission

to prescribe, with respect to the use by motor carriers . . . of motor vehicles *not owned by them*, in the furnishing of transportation of property—

\* \* \* \* \*

(2) such . . . regulations as may be reasonably necessary in order to assure that while motor vehicles are being so used the motor carriers will have full direction and control of such vehicles and

will be fully responsible for the operation thereof in accordance with applicable law and regulations, as if they were the owners of such vehicles, including the requirements prescribed by or under the provisions of this chapter with respect to safety of operation and equipment and inspection thereof, which requirements may include but shall not be limited to promulgation of regulations requiring liability and cargo insurance covering all such equipment.

49 U.S.C. § 304(e).

corrective steps with the lease owner to avoid any repetition of such incidents.

More specifically, the Employer's control over the means by which the lease owners perform their tasks is evidenced by its initial determination of qualification of any driver hired by a lease owner, by its disqualification of any driver who fails to perform satisfactorily, by its requiring leased equipment to be inspected every 20 days, by its exclusive use of all leased equipment for the term of the lease, and by its performance of all dispatching services for both company and lease drivers alike. Also, the lease drivers are required to submit a daily driver's log and trip report and manifest to the Company; each truck is required to exhibit the Employer's name and identification number; and Deaton maintains a personnel file on all drivers with respect to accidents and qualifications. Furthermore, the Employer, through its authority to terminate the lease at will 30 days after the commencement thereof, retains potential authority to control virtually every aspect of the means by which the lease owners conduct their operations in its behalf.

187 N.L.R.B. No. 102 at——, 76 L.R.R.M. at ——.

Despite Deaton's urging to the contrary, we cannot ignore or discount the items that are requirements imposed by federal regulations.[9] As discussed above, we assess the total controls, including both ICC-mandated controls and additional controls. The Board's findings that Deaton possessed the federally-mandated controls are supported by substantial evidence, and we would in any event be bound to assume that the company was in compliance with regulations. The existence of additional con-

trols also is shown by substantial evidence. For example, Deaton "checks out" all drivers before permitting them to drive trucks leased from multiple-owner drivers. 49 C.F.R. §§ 391.21 and 391.23 require Deaton to make certain inquiries, but the record shows that Deaton went farther than was required. D. B. Lockridge, Deaton's president, gave the following testimony before the Hearing Examiner:

Q. [By the union attorney] How do you determine if a driver of a lease owner or a lease owner meets the qualifications of Deaton?

A. Well, I thought I had explained that. We check him out. We check his references where he worked, check his police record, his driving record. And this we determine  .  .  .

Q. How is this filed? How was this filed with the company? How does the company have this?

A. The lease operator—the lease operator presents a man to the personnel department and says, "I want this man checked out to drive my truck." We take the man's name, the record of his previous employment, and we check him out. And then we tell the lease operator, "He checks out all right" or "he doesn't check out all right."

If he doesn't check out all right, we tell him he has a record of accidents that are a mile long, he's had five chargeable accidents that directly contributed to—by negligence, recklessness, and we don't think you want him driving your trucks, and we know we don't want him driving a truck for us and subjecting us to lawsuits, and claims and penalties.

Thus it appears that Deaton had power over the hiring decisions of its multiple-owner drivers. Nor was the scope of this power limited to forbidding the hir-

---

9. The Board listed as a control factor the performance by Deaton of dispatching services for drivers of leased trucks as well as drivers of Deaton-owned trucks. In finding substantial evidence of sufficient total con-

trols over the manner and means of achieving the transportation of goods from one place to another, we place no reliance upon this factor.

ing of persons legally disqualified from driving commercial motor vehicles under federal regulations, as Lockridge's further testimony shows:

> HEARING OFFICER: Before an owner driver or a multiple owner driver has someone drive their vehicle, must that person file an application with Deaton?

> WITNESS: Not necessarily an application. We want to know some history on it so that we can check him out and determine what his past record is.

> HEARING OFFICER: And once again, the purpose of that is for liability insurance?

> WITNESS: The purpose of that is to determine whether or not his record is such that you wouldn't—he wouldn't be—he would be a good risk, whether or not his record is such that a federal regulatory agency; the Department of Transportation, to be specific, would not be critical of our operators.

Deaton's practice of assessing whether a driver was a "good risk" involved a subjective, employer-like inquiry different in quality from merely making sure he was not barred by law from commercial driving.

Deaton's power over multiple-owner drivers' personnel decisions continued beyond the initial determination of qualification stage. There is evidence that for lateness in making deliveries, for dishonest handling of money collected from customers, or for "just loafing," a nonowner driver can, in effect, be fired by Deaton. After a lease has been in force for 30 days (the minimum lease period allowed by regulations, see 49 C.

F.R. § 1057.4(a)(3)), either party may terminate it at will upon written notice. As the Board noted in its opinion, this gives the company a handle by which to control nonowner-drivers. By threatening a multiple-owner driver with cancellation of his lease, Deaton can make him fire a driver whom it considers undesirable.

> Q. [By the union's attorney] If you tell a lease owner to get another driver and he doesn't do it, do you disqualify that driver?

> A. Do I disqualify the driver?

> Q. Right. You tell a lease owner to get another driver and he says, "No, I don't want to do that. I want to keep this driver."

> A. Well, we tell him that he's perfectly free to keep him, but not driving a truck that's leased to us.

> [Deaton's attorney] That's what we call him disqualifying from driving in the fleet.

There was some evidence that the company exercised its power only for dishonesty or violations of state or federal regulations that would in any event make it illegal to keep the offending driver on. There was also testimony that other, more subjectively defined transgressions triggered exercise of the power.[10] Even if dishonesty were the only behavior that normally led to "disqualification" (i. e., firing by Deaton), the fact remains that the company had the power to disqualify nonowner drivers if it became dissatisfied with their performance. Under the control test, the right of control, even if unexercised, is the crucial element.

Moreover, it appears that Deaton possessed and exercised less drastic means

10. Q. [Deaton's attorney] Now, if a person violates safety regulations or fails to account for his money, or don't take his load there and just loafs, and had more th[a]n ample time to get there, do we at times disqualify that man from further driving in the Deaton fleet?
A. [Lockridge] Yes, we do. If he's dishonest, he steals from the company. We tell the lease operator we will not permit them to drive a truck leased to us, that he has the choice of either furnishing another driver or cancelling the lease on the truck, whichever he chooses to do, or if he has other trucks leased elsewhere he may put them somewhere else.

of asserting control over certain aspects of non-owner drivers' conduct.

HEARING OFFICER: Have you ever had any of your customers complain about any of the drivers of vehicles bearing the Deaton insignia?

WITNESS [Lockridge]: Oh, yes. Yes, we've had customers to tell us, "Don't send that blankety-blank so and so back in here anymore. If you do, we're not going to load it, or it you do, we're not going to unload it." And this is true with company drivers and this is true with lease operator's drivers.

HEARING OFFICER: What you do when this happens?

WITNESS: Well, we tell the lease operators that he cannot go back to Plant X because they refuse to load it, refuse to permit him on their premises. And if he wants to have somebody else load at Plant X when that man's time comes to load, fine. But we will not permit that man to go back to Plant X, or we'll load the trailer for him.

HEARING OFFICER: What about the driver for someone who leases a vehicle to you?

[Deaton's attorney]: That's what he was talking about.

HEARING OFFICER: Multiple owner driver. You go to that multiple owner and say, "Don't send Driver X to Customer Y"?

WITNESS: Well, we tell him that we can't send him back there for loading or unloading because of the complaint registered by the customer, and it's up to him what he's going to do from there on. If he wants to retain the man as a driver on his truck and pay us to load for him, we'll do so. If he wants to load for him himself, he may do so, but we will not send the driver back to that place of business and we would not permit the driver to go back to that place of business after being instructed by the shipper not to send that particular individual back to his premises.

█ In sum, substantial evidence drawn from the record as a whole supports the Board's conclusion that single-truck owner-drivers and nonowner-drivers, being "employees," were properly included in the bargaining unit. The Board's finding represents, at the least, a "fairly conflicting view" which we are not empowered to displace.

█ Deaton asks us to remand the case for rehearing by the entire Board [11] on the ground that the 1971 decision is out of harmony with subsequent Board cases. Even if subsequent cases reaching the opposite result are truly indistinguishable, it is not our province to insure an abstract and academic consistency in Board decisions. The personnel and philosophies of administrative bodies are subject to constant change. Especially in an area as fraught with technical distinctions and as dependent on factfindings as the employee-independent contractor dichotomy,[12] we should decline to interfere with a Board decision reached through orderly processes under proper legal standards and supported by substantial evidence. To intervene at this point would work against the essential policy of the Act, encouraging parties to delay compliance with Board orders for as long as possible in the hope of finding support in later Board decisions and of securing a *locus poenitentiae through the intervention of a court of appeals.*

█ The 1973 order does not violate § 8(d) of the Act, 29 U.S.C. § 158(d), the prohibition against requiring a party to make a bargaining concession.

11. The 1971 order was handed down by members Fanning, Jenkins, and Brown, with Chairman Miller in dissent. Member Brown has since left the Board, and two new members, Penello and Kennedy have joined it.

12. *Cf.* Maxwell Co. v. NLRB, 414 F.2d 477 (CA 6, 1969), in which the Sixth Circuit noted that while the Board has consistently followed the control principle in deciding employee versus independent contractor questions, it has evolved new ways of evaluating the facts and thus has reached differing results.

The company's theory is that the order compels it to yield the concession of exercising control over matters, wages of nonowner drivers, for instance, that it presently does not control.[13] It contended that the Board should let negotiations be confined to the things upon which the Board focused in finding company control and thus employee status, for example, multiple-owner drivers' hiring and firing decisions. This contention misses the point. If the total controls were sufficient to support a finding of employee status—and we agree with the Board that they were—then the workers must be regarded as employees for all purposes. We need not speculate about the mechanics of the bargaining process or the form that an agreement ultimately might take. Those matters depend upon what each party offers and what each is able to secure in the way of concessions from the other.[14]

The order of the Board is enforced.

---

13. After the election Deaton informally offered to bargain over all subjects that it controlled. We agree with the Board that this amounted to no more than a reassertion of the position that single-truck owner-drivers and nonowner drivers were not Deaton employees.

14. We do not share Deaton's sense of the incongruity of making an employer bargain about matters over which in the past it has lacked the usual type of full control. We note that other truck lines with similar structures have been required by the Board and the courts to bargain with units including single-truck owner-drivers and nonowner drivers.