NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRI–STATE TRANSPORT
CORPORATION,
Respondent.

No. 80–1270.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 12, 1980.

Decided May 21, 1981.

994

Jolane A. Findley, N.L.R.B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Washington, D. C., on brief), for petitioner.

Maxwell A. Howell, Washington, D. C., for respondent.

Before HAYNSWORTH, Chief Judge, INGRAHAM, Senior Circuit Judge,* and MURNAGHAN, Circuit Judge.

INGRAHAM, Circuit Judge.

Pursuant to section 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e) (1976), the National Labor Relations Board (the Board) seeks enforcement of its order issued on September 28, 1979, against Tri-State Transport Corporation (Tri-State) of Wheeling, West Virginia. After formal hearing, the Administrative Law Judge (ALJ) concluded that Henry Cunningham was an employee of Tri-State within the meaning of section 2(3) of the Act, 29 U.S.C. § 152(3) (1976). The ALJ further concluded that Tri-State discharged Cunningham for participating in a strike by other drivers against the company, in violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1976). The Board adopted the findings and conclusions of the ALJ and ordered Tri-State to offer Cunningham reinstatement and make him whole for any lost earnings.

* Honorable Joe M. Ingraham, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

Tri-State raises two principal arguments on appeal. The first argument is that since counsel for the company was detained at the last moment by other legal proceedings and the company's defense was inadequately presented by its non-lawyer president Mrs. Jean Witsberger, and for other reasons, the company did not receive a fair hearing before the ALJ. The second argument is that since Cunningham was not an employee of Tri-State within the meaning of section 2(3) of the Act, the cessation of his business affiliation with Tri-State was not a violation of section 8(a)(1). Because we hold that Tri-State's position with respect to the second argument is correct, we do not reach the issues raised by the company in its first argument.

I.

The dispositive issue in this case is the legal status of Cunningham's relationship to Tri-State. This is the only issue on which the ALJ took testimony at the hearing. Based on the testimony given and the exhibits admitted, the ALJ found that Cunningham was an employee of Tri-State. On this application for enforcement, our standard of review is to determine whether there is substantial evidence on the record as a whole to support that finding. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Section 2(3) provides, in relevant part, that the term "employee" shall not include "any individual having the status of independent contractor." In enacting this provision, Congress did not define the status of independent contractor but intended instead that in each specific case the question whether an individual were an employee or an independent contractor was to be determined by the application of general agency principles. *See NLRB v. United Insurance Co.*, 390 U.S. 254, 256, 88 S.Ct. 988, 989, 19 L.Ed.2d 1083 (1968); *NLRB v. A. S. Abell Co.*, 327 F.2d 1, 4 (4th Cir. 1964).

Thus, the Board's decision in this case involved not only factual findings by the ALJ but also the application of common law principles to those facts. Accordingly, the decision, although not one in which the Board had to apply its special expertise, should be upheld if the Board chose between two fairly conflicting views. *NLRB v. United Insurance Co.*, 390 U.S. at 260, 88 S.Ct. at 991.

In distinguishing employees from independent contractors,

> there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common law agency principles.

*Id.* at 258, 88 S.Ct. at 990. Those common law principles may be referred to as the right-to-control test.

In this case, there is the further consideration that Tri-State is a trucking firm engaged in the interstate carriage of pipe, authorized to operate under a certificate of public convenience and necessity issued by the Interstate Commerce Commission (ICC). Tri-State also must comply with numerous regulations of the Department of Transportation (DOT). The common law test of right-to-control has proven especially difficult to apply in cases involving owner-operators and non-owner drivers of trucks leased to carriers governed by these ICC and DOT regulations. *See Local 814, International Brotherhood of Teamsters v. NLRB*, 512 F.2d 564, 568 (D.C.Cir. 1975) (Bazelon, J., dissenting).

Under the applicable regulations, carriers are required to demand certain information from and to impose certain rules on all drivers, regardless of the particular contrac-tual arrangements between the carrier and those drivers.[1] The number and nature of the government controls create an appearance of employee status. This is true even in situations where the contractual arrangements expressly disclaim any such relationship[2] and the actual practice of the parties belies any such inference. As a result, the Board and the courts have struggled to develop an appropriate rule for weighing the government regulations in the assessment of the overall factual context. The following standard can be discerned from the cases: A contractor is an employee only if there was "a layer of carrier regulation put upon the contractor beyond what was required by government regulation, impairing the contractor's independence." *Local 814, International Brotherhood of Teamsters (Santini Bros., Inc.)*, 208 N.L.R.B. 184, 197 n.18 (1974), *remanded for clarification*, 512 F.2d 564 (D.C.Cir.1975), *clarified and upheld*, 223 N.L.R.B. 752 (1976).

II.

We now turn to the record to examine the factual incidents of the relationship between Tri-State and Cunningham. At this point it is necessary to introduce one more principal actor of the *dramatis personae*, Joseph Coss. Coss owned two truck-tractors and two flatbed trailers of the type required in Tri-State's hauling business. Cunningham had driven for Coss before. Witsberger, president of Tri-State, was looking for access to more capacity than she had at the time. Witsberger learned from another about Coss and Cunningham. She called Cunningham and the drama began to unfold.

Coss was hospitalized at the time. Cunningham, armed with a power of attorney from Coss, went to Tri-State along with Coss' wife, Violet. A lease agreement covering one tractor-trailer rig was prepared

---

1. For an appreciation of the extent of some of those regulations, see Parts 391, 392, 394, 395, 1043, and 1057 of 49 C.F.R. (1979).

2. For example, the leases involved in this case were preprinted forms. In certain places, where choices were to be made, the parties were to signify their intent by striking out the unwanted language, thusly: "Lessor/~~Lessee~~ agrees to accept ...." On each lease, the following sentence was entirely stricken: "The Lessee shall be responsible for the driver or drivers of subject vehicles and said driver(s) shall be employees of the Lessee."

by Tri-State's general manager and executed by Violet Coss for her husband, as lessor, and Jean Witsberger, president of Tri-State, as lessee. The lease provided for various divisions of responsibility between Coss and Tri-State, many of which provisions obligated Tri-State as the result of federal and state regulations. Apart from those, lessor Coss assumed responsibility for the following items: furnishing all licenses necessary for the intended operation of his truck and trailer; payment of all fines and penalties incurred as a result of any unlawful operation of the rig; and responsibility for all maintenance costs. Tri-State undertook to insure against damage to the public and to cargo, but Coss had to insure against damage to the equipment itself. Coss was to receive seventy-five percent of the gross revenue, out of which he was to pay the driver's wages and the costs of operating the equipment.[3]

The individual who was the general manager of Tri-State during the relevant period testified that he understood Cunningham to be a driver in the employ of the owner-broker of the equipment, Coss. Witsberger testified that Violet Coss represented her husband and Cunningham as being in "sort of a partnership." Violet Coss testified that her husband and Cunningham were not in fact partners. Cunningham testified that he considered himself to be an employee of Tri-State. Witsberger, proceeding pro se, did not cross-examine Cunningham concerning any representations made at that first meeting. There were no other witnesses called who were present at that meeting.

Witsberger testified without contradiction that if Cunningham were unable to drive the Coss tractor-trailer rig, she would have to contact Coss for his permission to put some other driver on that rig. Mrs. Witsberger further testified that in order to dispatch Cunningham, unless he called in, she had to contact Joseph or Violet Coss

and have one of them instruct Cunningham to check with the company. Mrs. Coss verified this routing of information was employed on several occasions.

At the outset, Cunningham supplied certain information that was recorded by Tri-State's general manager on a form entitled "Application for Employment." The application form was introduced into evidence by counsel for the General Counsel. The form was only partially completed. Another application form was submitted on behalf of the General Counsel, covering a person conceded by Tri-State to be an employee, to show that Cunningham filled out the same form as the "other" employees. The information solicited from Cunningham was no more than that required by federal regulations,[4] and it is not surprising that a company whose general manager worked only part-time did not have special pre-printed forms for non-employee drivers. More significant to us is that the classification of the conceded employee was "Road driver," whereas the classification of Cunningham was "Road driver for Broker—J. Coss." Even more significant, perhaps, is the inscription that Cunningham on July 27, 1978, was "Discharged by Broker—J. Coss," and on September 18, 1978, was "reinstated by Broker—J. Coss."

After Cunningham began driving, the first four checks for the lessor's seventy-five percent of the rig's weekly gross were made payable to Cunningham. Witsberger testified without contradiction that this arrangement was at the instruction of Coss, who did not want another source of his income jeopardized by extra earnings during the month he was hospitalized. Thereafter, having consulted his attorney regarding the matter, Coss instructed Witsberger to make the checks payable directly to him. Witsberger never made tax, social security, or other payroll deductions from the Coss Cunningham earnings, as she did for certain other drivers who she considered to be employees of Tri-State.

---

3. Cunningham's arrangement with Coss appears to have been that he would receive twenty-five percent of whatever amount Coss received from Tri-State.

4. In fact, although the printed form seems to comport with the requirements of 49 C.F.R. § 391.21, responses were not recorded for many of the questions.

On one occasion, Witsberger attempted to dispatch Cunningham on a trip to Jamesburg, New Jersey. Cunningham refused to make the trip. On direct examination by counsel for the General Counsel, he testified that his reason for refusing the run was that "we couldn't make any money on that run because we had to cross the mountains and fuel was so high and we had to pay for our own turnpike fees." He further testified that Witsberger stated that she would call Coss and that "if [Cunningham] didn't want to make the run to just park the truck."

Subsequent to the lease covering the tractor-trailer rig that was to be driven by Cunningham, Coss entered into another lease agreement with Tri-State. The second lease covered a different tractor-trailer rig that Coss personally drove. Under this lease, Coss received only sixty-two percent of the gross revenue earned by the rig. Although Coss was contractually obligated to carry the physical damage insurance on the rig, he testified that he did not have it insured and was therefore "very careful with it." At one point when he was ill, Coss had another person drive that rig. On the third trip, the person had an accident that damaged the cargo on the flatbed trailer but that did not damage the rig itself. The driver was promptly terminated. Although Coss characterized the termination decision as having been made by Witsberger with his consent, it is instructive to note that Witsberger told Coss about the accident and then he, not Witsberger, went to the driver and demanded the keys to the truck.

On November 9, 1978, Witsberger sent a letter to Coss advising him that she was terminating the leases on his two tractor-trailer rigs. The following weekend, Coss contacted Cunningham. According to Cunningham, "[Coss] said that I was laid off because she fired his truck."

### III.

The ALJ acknowledged in his opinion that "much, if not all of this so-called control is dictated by Interstate Commerce Commission rules and regulations and does not necessarily create an employer-employee relationship." He went on to conclude, however, that on balance the record facts supported "a finding that although Cunningham might have been (without any specific record showing) some sort of profit sharer or agent for Coss, he was also an employee of [Tri-State]." We reach the opposite conclusion. We find that there is not substantial evidence in the record to support the finding that Cunningham was an employee of Tri-State. Instead, the record substantially supports the conclusion that Cunningham was either an employee of or a profit sharer with Joseph Coss.[5] The factors relied upon by the ALJ are for the most part expressions or consequences of the rules and regulations of the ICC and the DOT. Once those controls are stripped away, what little control remains is simply not sufficient to support the conclusion that Tri-State was an employer of Henry Cunningham *qua* employee. *See, e. g., NLRB v. A. Duie Pyle, Inc.*, 606 F.2d 379 (3rd Cir. 1979); *Local 814, International Brotherhood of Teamsters (Santini Bros., Inc.,)*, 208 N.L.R.B. 184 (1974), *remanded for clarification*, 512 F.2d 564 (D.C.Cir.1975), *clarified and upheld*, 223 N.L.R.B. 752 (1976). Accordingly, the application for enforcement of the Board's order must be denied.

*ENFORCEMENT DENIED.*

MURNAGHAN, Circuit Judge, dissenting:

The case concerns whether Henry Cunningham was an "employee" of Tri-State Transport Corporation (Tri-State), and

---

5. We note that at the hearing the ALJ adverted to "a lead case on this called Greyhound," noting that perhaps Cunningham was an employee of *both* Coss and Tri-State for purposes of the right-to-control test. We further note that the ALJ did not base any part of his written opinion on any case involving a party named Greyhound. The ALJ expressly stated that Cunningham's relationship to Coss "is not clarified in the record." Given our conclusion that Cunningham is *not* an employee of Tri-State, we need not question the propriety of the ALJ's failure to clarify the nature of his relationship to Coss.

therefore covered by the National Labor Relations Act, 29 U.S.C. § 152(3) (1976), or whether he possessed independent contractor, or some other inconsistent status in relation to a vehicle lessor, deemed to exclude him from the protections of the Act. Because I believe that the record as a whole evidences substantial support for the Board's view that Cunningham was an employee within the meaning of § 2(3) of the Act, 29 U.S.C. § 152(3), I respectfully dissent.[1]

In the labor relations context, Congress has entrusted the Board with the principal duty of determining whether a particular person is an employee or not. Under the substantial evidence standard, where there are two "fairly conflicting views" of the matter, a reviewing court must defer to the Board's judgment. *NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Our mission on review is not to sift and weigh the evidence, or to choose between conflicting versions of the facts, but solely to determine whether the line the Board has drawn is reasonably based in the record. The majority view, unfortunately, allows insufficient weight to certain significant evidence upon which the Board has relied, and fails altogether to mention other facts which for the Board were dispositive. The majority decision amounts to a *de novo* review of Cunningham's status and concludes that Cunningham "was either an employee of or a profit sharer with Joseph Coss." At 997. There appears to be an implicit further conclusion that such status would preclude a finding that Cunningham was a Tri-State employee. With respect, I disagree with the majority's conclusions.

As a basis for departure, I first mention my agreement with the majority position that whether a particular person is an employee is to be tested under the "right to control" doctrine borrowed from the common law of agency. *NLRB v. A. S. Abell Co.*, 327 F.2d 1, 4 (4th Cir. 1964). *See*

*United Ins. Co., supra*, 390 U.S. at 258, 88 S.Ct. at 990. Applying the right to control criterion has proved to be a difficult proposition for both the Board and the courts of appeal in the context of the highly regulated trucking industry in which the classic employer-employee relationship is rarely found. In the interests of responsible trucking and highway safety, government agencies such as the Interstate Commerce Commission (ICC) and the Department of Transportation (DOT) require carriers to adopt particular relationships to equipment lessors and exert certain types of controls over the drivers of leased vehicles. One issue is the weight to be accorded those aspects of an employment relationship that are mandated by federal regulations. As does the majority, I reject the view that the forms of employee control mandated by such regulations, merely because compelled or "involuntary," should therefore be discarded in determining employee status.

First, many employers are "involuntarily" subject to the provisions of the Act. Second, while perhaps involuntary for an employer, obedience to ICC or DOT regulations is also involuntary for the employee. If Congress and various regulatory agencies have validly required the nation's shippers or haulers to exercise considerable control over their drivers in the interest of highway safety, there is no reason why such controls should not play a significant role in determining whether certain drivers are "employees" within the meaning of the Labor Relations Act. For purposes of tort law and workers compensation, the government regulations create what has been termed a "statutory employee." *White v. Excalibur Ins. Co.*, 599 F.2d 50, 52–53 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1979). Consequently, if the overall effect of government regulation is to *require* someone to exercise employer-like controls over a particular person, he is nonetheless an employee. Congress contemplated that such a statutory employee should be accorded the labor Act's protec-

1. Obviously, this is not to say that, acting independently as a finder of fact, I would have reached the same result as the NLRB. I con-

clude only that there was substantial evidence to support the decision which the NLRB reached.

tions against potential abuses of employer power, even though the employer might have preferred a relationship other than that of employer-employee.

Recognizing that the right to control, and not the reason for its existence, is the crucial element, apparently every reviewing court decision in the trucking context relies on regulatory mandates as significant, if not definitive, factors in resolving the question of whether a particular driver is an employee. *See, e. g., NLRB v. A. Duie Pyle, Inc.,* 606 F.2d 379, 385 (3d Cir. 1979); *NLRB v. Deaton, Inc.,* 502 F.2d 1221, 1225 (5th Cir. 1975), *cert. denied,* 442 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975). Therefore, we are called upon carefully to consider all incidents governing the actual relationship between the parties, *see United Ins. Co., supra,* 390 U.S. at 258–60, 88 S.Ct. at 990–91, without regard to whether some of the control derives from government regulation. *Ace Doran Hauling & Rigging Co. v. NLRB,* 462 F.2d 190, 194 (6th Cir. 1972). Furthermore, and in any event, the Board relied on ample evidence showing that Tri-State exercised controls over Cunningham that substantially exceeded Tri-State controls arguably mandated by federal regulations.

Evidence received at the hearing showed that Cunningham, an unemployed driver, had accompanied Violet Coss, wife of Joseph Coss, to negotiate the equipment lease.[2] The same day, Cunningham filled out an "Application for Employment" required by Tri-State of all its employees.[3] In accordance with federal regulations governing "regularly employed drivers," Cunningham was given a physical examination and a truckdriving test.[4] Significantly, the lease gave Tri-State "exclusive possession, control, and use of equipment for the duration of this Agreement." *See Deaton, supra,* 502 F.2d at 1225 ("Control over trucks involves control over drivers"). Tri-State also assumed responsibility for insuring the truck and the driver for public liability and property damage.

2. Cunningham stated at the hearing that he possessed a power of attorney from Coss to negotiate the equipment lease. However, Violet Coss, not Cunningham, actually signed the lease. Moreover, Cunningham stated that the parties did not bargain over the terms of the lease. Therefore, there is little significance in the fact that Cunningham may have assisted Violet Coss on behalf of the hospitalized Joe Coss.

3. The majority opinion dismisses the significance of Tri-State's giving Cunningham an "Application for Employment" to fill out for several reasons. First, it states that the application "was only partially completed," implying that substantial sections were left blank. However, the form was as complete as a similar form introduced into evidence, which had been submitted by an admitted Tri-State employee. Cunningham responded to each section of the three-page form, leaving blank such items as "reason for [previously] leaving [Tri-State]" when he had already indicated he had never previously worked for the company. Second, the majority suggests the application solicited only information "required by federal regulations." However, federal regulations specifically exempt carriers from requiring applications of "a person who is not a regularly employed driver ... [or who drives] on an intermittent, casual, or occasional basis," or who is a regularly employed driver of another carrier. *See* 49 C.F.R. 391.63, 391.65 (1977). If, as suggested by the majority, Cunningham was employed by another carrier, Cunningham need not have filed this information. Therefore, Cunningham's filling out the application suggests he did something more than required by federal regulations. Cunningham indicated on his application form that he was not currently employed.

Third, the majority speculates that "it is not surprising that a company whose general manager worked only part-time did not have special pre-printed forms for non-employee drivers." At 996. However, neither should it surprise us that a company that hired Cunningham as its employee might use the same form required of other employees. Moreover, there was no testimony to the effect that Tri-State did *not* have forms for non-employee drivers. The Board was entitled to point to the "Application for Employment" as evidence of Cunningham's employee status.

Finally, the majority opinion gives no weight to the fact that, in the response to the application inquiry "Are you now employed?", Cunningham wrote "no." And, in a space denominated "Applicant hired/rejected," a Tri-State official had checked the "hired" space and written in the "date employed" as June 10, 1978.

4. Also in accordance with government regulations, the leased equipment bore Tri-State's name and address.

Over and beyond the "involuntary" incidents to which we have referred, and which constitute evidence that an employer-employee relationship existed between Tri-State and Cunningham, the Board also relied on extensive record evidence showing that Tri-State, as a matter of choice and not as a consequence of ICC or DOT mandates, repeatedly and directly exercised controls over Cunningham's work. The controls took three distinct forms: first, the evidence was abundant and uncontradicted that Jean Witsberger, President of Tri-State, held herself out to Cunningham, Coss, and Coss' wife as Cunningham's "boss,", and imposed upon Cunningham a special code of conduct; second, Tri-State exercised direct and immediate supervision of Cunningham's work; and third, Tri-State enforced certain rules that effectively prevented Cunningham from seeking or accepting other work.

First, the evidence showed that Tri-State held itself out as Cunningham's employer. Under General Counsel examination, Cunningham testified without contradiction that, after he had filled out the employment application and passed the tests, Witsberger took him aside, and, in private, gave him instructions:

Q. Who did you talk to after you completed all of these application procedures?
A. Jean Witsberger.
Q. What do you recall being said at that time?
A. She said that she leased the truck and I was hired as a driver.
Q. Do you recall anything else?
A. She said I was hired and was working for Jean Witsberger not Joe Coss, and I was not to have any unauthorized passengers, no hitchhikers, and no female passengers, and there would be no moonlighting or we would be dismissed, and if we didn't turn our logs in on time we wouldn't get paid.
Q. Do you recall anything else being said at that time?
A. She said that there would be no drinking, or loafing in the shop or we would be dismissed.[5]

Some of the instructions directed to Cunningham by Witsberger (no drinking while driving, e. g.) are mandated by law.[6] Some (e. g., loafing in the shop, moonlighting, turning in of logs on time) are not. The substance of Witsberger's instructions possesses the character of an employer's charge to its employee. Combined with Witsberger's demand, as stated by the ALJ, "that Cunningham follow *only* her instructions," the demand for compliance with the employee code of driver behavior, no matter how reasonable or unreasonable the rules it contained, structured Cunningham's working environment in a manner supportive of the Board's conclusion that Cunningham was an employee subject to Tri-State's control. *See Aetna Freight Lines v. NLRB,* 520 F.2d 928, 931 (6th Cir. 1975), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 314 (1976). The majority opinion is altogether silent on that testimony, and consequently accorded it no significance.

In addition to the content of the instructions, it is worth noting the context in which they were made. After directing Cunningham to complete an application form and take tests required of other employees, Witsberger excused a bystander—Mrs. Coss—in order to instruct Cunningham in Tri-State's special rules of employee conduct, without an outsider present. Referring to the time of the initial signing of the lease, Mrs. Coss testified under cross-examination by Witsberger that "I assumed he was your [Tri-State's] driver, if you recall you asked me if I would step outside for a

---

5. Joe Coss testified that Witsberger subsequently repeated the conversation to him. His version of what occurred was substantially the same as Cunningham's version. Moreover, President Witsberger admitted the conversation occurred, though she contended that the rules were required by DOT regulations.

6. Even as to the requirements mandated by regulation, a word should be said about the penalty for infraction. A federal regulation forbids drivers from drinking. *See* 49 C.F.R. § 392.5. But the regulation neither requires a lecture on the rule by the carrier, nor necessitates that, for infraction of the regulation, the driver be dismissed.

while, you wanted to instruct your driver in privacy, and I went out on the porch at that time, [and in] approximately ten or fifteen minutes you opened the door and told me I could come back in."

Moreover, that Witsberger, not Coss, possessed the authority to hire and fire Cunningham is illustrated by each incident in which there was conflict between Witsberger and Cunningham.[7] For example, Witsberger, not Coss, threatened to discharge Cunningham after she learned he might have carried an unauthorized female passenger. Further, Cunningham was required to accept all dispatch assignments directly from Tri-State; this too supports the Board's conclusion that Tri-State exercised control over Cunningham. On one occasion, Cunningham initially refused to make a run to Jamesburg, New Jersey, because, since Tri-State's drivers received a percentage of the gross, he thought he would lose money. However, after Witsberger became angry, Cunningham decided to make the run rather than risk losing his job. Again, it was Witsberger, not Coss, who prevailed on Cunningham to make the run. Indeed, Coss testified that since he, too, lost money on the run, he would have told Cunningham not to make the run if he had thought it would do any good. Yet Witsberger's wishes were the ones that counted.

On several other occasions, according to Cunningham, Witsberger in direct communication with him emphasized that she, not Coss, was the "boss." The term certainly carries the connotation of "employer." Additionally, Coss testified about two instances in the first of which Witsberger "made the rules clear that she was the boss[;] I tried to interrupt her once and she said to me [']I am not through talking, you shut up until I get through talking['].” On the second occasion, when Cunningham was refusing to make the Jamesburg run, Coss told Witsberger "Jean, you are his boss, I am not his boss, you ordered him to take it, you do what you want to . . . ."[8] Again, the testimony, although not mentioned by the majority, supports the Board's conclusion.

Turning from *assertions* by Tri-State of employer status over Cunningham to evidence that Tri-State in fact *exercised* direct and immediate supervision over Cunningham's work, it should be observed that it was Tri-State, not Coss, who dispatched Cunningham on various trips, told him where to go, what loads to pick up, and where to deliver the loads. That Witsberger sometimes left messages with the Coss's for Cunningham to call in does not support the majority's declaration that *dispatch* information was "routed" through Joe Coss. At 996. No one testified that Coss ever personally directed Cunningham where to go or what loads to pick up. On the contrary, Tri-State's dispatch procedure called for Witsberger, not Coss, to direct Cunningham to his destination. Tri-State set the schedule of hours and driving timetables, and checked his activities through the use of logs. If Cunningham did not already

7. As support for its belief that Cunningham was an employee of Coss, not Tri-State, the majority points to an incident in which a driver of another of Coss' vehicles was involved in an accident and Coss, not Witsberger, took the other driver's keys away. Whatever probative value the symbolic act of collecting keys from the *other* driver has for suggesting that Coss was *his* employer, the issue here is *Cunningham's* status.

8. The majority refers to Witsberger's testimony that if Cunningham were unable to drive the leased vehicles, "she would have to contact Coss for his permission to put some other driver on that rig." At 996. However, President Witsberger admitted that her statement was purely hypothetical as the situation had never arisen. The ALJ described no significance to

Witsberger's conjecture in the heat of litigation. Furthermore, the terms of the lease contradict Witsberger's assertion. The lease provided that Tri-State "shall have exclusive possession, control, and use of equipment for the duration of this Agreement." While the lease vests explicit authority over the vehicle in Tri-State, it says nothing about Coss' authority to approve a driver. In any case, even if Coss' approval of a substitute driver would have been required, little light is thereby cast upon Cunningham's relationship to Tri-State. There is nothing surprising about an arrangement between the lessor and the lessee of equipment by which the lessor would only permit it to be operated by a *lessee employee* approved by lessor.

know what route to follow, he checked with Tri-State, not Coss. When he reached the end of a run, he was to call Witsberger, not Coss, for instructions regarding any backhaul. The long distance phone calls were paid for by Tri-State. Upon returning from a run, Cunningham would again contact Witsberger. The occasional use of Coss as a relay for getting the message to Cunningham provides no necessary inference that Coss controlled Cunningham's routes, or, indeed, contributed in any way to the content of the message. Substantial evidence supports the Board's conclusion that Witsberger dispatched Cunningham and that she did not go through Coss in controlling Cunningham's movements.

In *Aetna Freight Lines, supra*, 520 F.2d at 930, the court relied primarily upon two indicia of control, in addition to the elements imposed by governmental regulation, in sustaining a Board finding that an employer/employee relationship existed. First, Aetna exercised control over the hiring and firing of drivers by "employing lease cancellation as a means of enforcing driver discipline and discharge." *Id.* at 930. Here, Witsberger once threatened to discharge Cunningham after she learned he might have carried a female passenger.[9] Moreover, Cunningham made the Jamesburg run out of fear he would otherwise lose his job. Finally, when Cunningham refused to break the strike, the same day Witsberger indeed cancelled the equipment lease, and, accordingly, Cunningham's employment "partly in retaliation for Cunningham's refusal to cross [Tri-State's] employees' picket line," in the words of the ALJ. The company's retention of the right to discharge Cunningham is a further indication of his employee status.

Second, in *Aetna*, drivers took complaints to and received instructions concerning daily tasks from Aetna, and not the equipment owner. Here, like the employer in *Aetna*, Tri-State directly supervised and gave daily instructions to Cunningham. Tri-State did all dispatching, and required Cunningham to report directly to it, not to Coss. In addition, when Cunningham did not know what routes to take, he asked Witsberger. Finally, Cunningham retained little discretion over whether to accept particular assignments, a conclusion aptly illustrated by the Jamesburg incident. In sum, to quote the ALJ below, "[Tri-State] exercised virtually complete control over Cunningham's hours of work and other conditions of employment."

Other courts have reached results similar to *Aetna*. In *NLRB v. Deaton, Inc., supra*, 502 F.2d at 1226–28, for example, the court upheld a Board finding that nonowner drivers of leased vehicles were employees where, in addition to the controls mandated by federal regulations, the carrier (1) exercised power over the qualifications of the drivers that were hired beyond that required by law, and (2) exercised power over a driver's conduct by threatening the equipment owner with lease cancellation. *See also News-Journal Co. v. NLRB*, 447 F.2d 65 (3d Cir. 1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972); *Frank Hager, Inc.*, 230 NLRB 476, 477 n.10 (1977) (owner-operators are employees where carrier exercised control over "the assignment of runs, including the distance, the nature of the load, and to whom they deliver, the maintenance of their equipment, the selection of their insurance, and the performance standards with which they must comply").

The situation here is even stronger than that in *Aetna, et al.* Unlike *Aetna*, Tri-State held itself out as Cunningham's employer. Tri-State established detailed rules of day-to-day conduct for all its drivers, including both Cunningham and Coss (who also, on occasion, drove for Tri-State), infraction of which risked immediate termination. Thus, the parties' practices and understandings support the Board's conclusion that Cunningham was Tri-State's employee.

---

9. Cunningham's version of the event was corroborated by Coss. Coss testified about a conversation with President Witsberger in which she told him of her suspicion and stated that if she ever caught Cunningham with a female rider *she* would discharge him. Tri-State made no effort to discredit the story, of which the versions of Cunningham and Coss were consistent and which supported a conclusion that Cunningham was an employee of Tri-State.

Finally, indicative all on its own of the employer-employee relationship existing between Tri-State and Cunningham was Tri-State's insistence that Cunningham not engage in any backhauling on his own. The work Cunningham performed was performed exclusively for Tri-State. At the end of a run, Cunningham was required to return empty to the plant unless Tri-State had a pickup to assign him. Cunningham simply did not have the characteristics of an independent contractor when he depended solely on Tri-State for direction. The prohibition upon backhauling indicates that Cunningham lacked an entrepreneurial interest that diverged from Tri-State's. As pointed out below by the Administrative Law Judge, Tri-State's ban on moonlighting effectively gave it control over the amount of Cunningham's earnings.

In *Ace Doran Hauling & Rigging Co. v. NLRB, supra,* 462 F.2d at 194 (enforcing Board determination of employee status where drivers drove exclusively for company, and performed duties similar to those of other employees, even though driver-owners could refuse trips and were permitted to backhaul), the "exclusivity" principle was utilized to distinguish between those drivers who were employees because they "dr[o]ve 'exclusively' for Ace," and those who also performed other, unrelated work for the truckowner and were therefore nonemployees. *See also News-Journal Co. v. NLRB, supra,* 447 F.2d at 68 (upholding Board finding of employee status because the Board considered, among other factors, "the possibility of realizing additional profits through the exercise of entrepreneurial skill"). The absence of any possibility of Cunningham's realizing additional profits supports the Board's conclusion that he was Tri-State's employee.

The majority relies heavily on the method by which Cunningham was paid to support its assertion *ab initio* that Cunningham "was either an employee of or a profit sharer with Joseph Coss." At 997. It is true that the lease stated that Coss would receive "75% of gross revenue, including all driver wages and fringes which are the responsibility of the lessor [Coss]." However, the provision pertains to the *method* by which whoever drove the vehicle would receive payment, and itself sheds no light on the particular issue of what Cunningham was required to do, and of who supervised his activities. Indeed, uncontradicted hearing testimony indicates that Witsberger explicitly told Cunningham he would be paid 25% of the gross, because "her drivers get 25%." Further, even despite lease language to the contrary, when Cunningham first began driving the Coss equipment for Tri-State, Tri-State deducted Cunningham's 25% share from the rental, paid that directly to Cunningham, and then transmitted the balance to Coss. In addition, the ALJ found that Tri-State required Cunningham to maintain a trip log which had to be correctly maintained and turned over to it before Cunningham, as well as Coss, would be paid. That Tri-State, whose general manager wrote the lease, chose an indirect method by which to pay Cunningham cannot obscure the fact that it set the percentage of his wages and controlled his total income by virtue of its control over his driving assignments.[10]

Even were the majority correct in asserting that Cunningham was either an employee of or profit sharer with Coss, such conclusion does not resolve Cunningham's relationship to Tri-State. In *Boire v. Greyhound Corp.,* 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964), the Supreme Court affirmed that two employers may exercise sufficient control over an employee to qualify as a "joint employer." In *Boire,*

---

**10.** In footnote 3, At 996, the majority opinion hypothesizes: "Cunningham's arrangement with Coss appears to have been that he would receive twenty-five percent of whatever amount Coss received from Tri-State." The record contains no evidence that Coss and Cunningham ever made any such agreement. The only evidence pertaining to the percentage Cunningham would receive was Witsberger's statement to Cunningham that "her drivers get 25%."

The majority also points out that Tri-State did not make payroll deductions from Cunningham's earnings, although it did so for its other employees. Nothing in the record indicates who, if anyone, complied with legal requirements that payroll deductions of that nature be made.

the Board had found that Greyhound had contracted with another company to provide janitorial services at four terminals. While the independent contractor "hired, paid, disciplined, transferred, promoted and discharged the employees, Greyhound took part in setting up work schedules, in determining the number of employees required to meet those schedules, and in directing the work of the employees in question." 376 U.S. at 475, 84 S.Ct. at 895. In addition, the Board had found that Greyhound had prompted the discharge of a cleaning employee and that the independent contractor's supervisor visited the terminals irregularly. *Id.* Subsequent to the Supreme Court's decision, the Fifth Circuit enforced the Board determination that Greyhound was a joint employer. *NLRB v. Greyhound Corp.*, 368 F.2d 778 (5th Cir. 1966). In light of *Boire*, surely the evidence relied on here by the Board is sufficient to support its decision that Tri-State was Cunningham's employer. Even if the evidence is given the gloss put on by the majority, at best we would face two conflicting versions of the facts, in which event the Board's interpretation controls. *See United Ins., supra,* 390 U.S. at 260, 88 S.Ct. at 991.

There is another important reason for affirming the Board's decision. While there is no evidence in the case of intentional evasion of the Act, a ruling contrary to the Board's will encourage other employers to seek to expand the "nonemployee" category constructed by today's decision through unconventional arrangements with their employees.

11. Tri-State also contended that it was denied a fair hearing because, though it had engaged an attorney, it was represented at the hearing only by its president, Jean Witsberger, who is not an attorney. Tri-State neither requested a delay in the hearing, nor gave any indication to the ALJ that it preferred to appear with counsel. Additionally, although midway through the proceeding President Witsberger indicated that Tri-State's counsel was tied up elsewhere that day, she did not request postponement. Ms. Witsberger, president of an interstate carrier, was accorded great latitude in presenting her case to the ALJ, who also gave her assistance.

In factfinding proceedings such as this, a *pro se* litigant undoubtedly struggles at a grave disadvantage when opposed by attorneys well-

Therefore, since the Board's order is supported by substantial evidence in the record as a whole, I would grant the application for enforcement.[11]

versed in the legal significance attached to certain facts, and skilled in the art of exposing them to a hearing officer. However, the Labor Relations Act allows a party to choose its representative in appearing in Board proceedings, *see* 29 U.S.C. § 160(b) (1976), including a non-attorney. *See Tred-Air of California, Inc.*, 193 NLRB 672, 673 (1971), *enforced*, 82 LRRM 208(C (9th Cir. 1972), *cert. denied*, 411 U.S. 906, 93 S.Ct. 1529, 36 L.Ed.2d 195 (1973) (corporation may be represented by its president). Absent evidence that Tri-State objected to proceeding at the hearing without counsel, the case raises no tenable issue of due process. *Local Union No. 742, UBCJA v. NLRB*, 377 F.2d 929 (D.C. Cir. 1967).